[No. G033818. Fourth Dist., Div. Three. June 28, 2005.]

WALTER H. ROOT, Plaintiff and Appellant, v.
AMERICAN EQUITY SPECIALTY INSURANCE COMPANY, Defendant
and Respondent.

927

928

## COUNSEL

Root & Feinstein and Walter H. Root for Plaintiff and Appellant.

Weston & McElvain, Richard C. Weston and John F. Morning for Defendant and Respondent.

## OPINION

## SILLS, P. J.—

### I. INTRODUCTION

This case involves one of the worst nightmares faced by most every attorney, doctor, accountant or other professional covered by a malpractice insurance policy: the possibility of no malpractice coverage under a "claims made and reported" policy where a claim is made very late in the policy period and the insured learns of the claim under highly ambiguous circumstances, so the claim is not reported until there is confirmation of that claim, which is shortly after the policy has expired.

In such a situation, however, California's traditional common law of contracts bearing on forfeitures and conditions precedent offers a way out for the hapless insured. As our Supreme Court wrote almost 60 years ago, "And where, as in the insurance policies held by O'Morrow [the insured], the condition is express and cannot be avoided by construction, the court may, in a proper case, excuse compliance with it or give equitable relief against its enforcement." (*O'Morrow v. Borad* (1946) 27 Cal.2d 794, 800 [167 P.2d 483].) As we will now show, the reporting requirement in this case is such a condition that may be equitably excused under the particular circumstances of this case. Accordingly, we reverse the judgment obtained by the malpractice insurer on a summary judgment motion.

However, we emphasize the narrowness of today's decision. We will take great pains to show that by no means do we blanketly apply a blunderbuss "notice-prejudice" rule to this, or any other claims made and reported malpractice policy. (The notice-prejudice rule holds that "[u]nless an insurer can demonstrate actual prejudice from late notice, the insured's failure to provide timely notice will not defeat coverage." (See Croskey et al., Cal. Practice Guide: Insurance Litigation (The Rutter Group 2004) ¶ 3:168, p. 3-377.) In fact, we will devote some space to explaining why the

notice-prejudice rule sweeps much too broadly in the context of claims made and reported policies and should not be applied here. (On this point we will thus agree with existing case law.) Even so, there are at least a few times when the established common law of contracts (bearing on when the nonoccurrence of a condition precedent works a forfeiture) may operate to excuse the nonoccurrence of a condition, and this case is one of them.

## II. FACTS

### A. *The Claim*

Plaintiff Walter H. Root had a legal malpractice insurance policy with defendant American Equity Specialty Insurance Company. The policy period ran from February 28, 1998 to midnight, Sunday February 28, 1999. Afterwards, Root had legal malpractice insurance with another insurer, not otherwise disclosed in the record.

On Thursday, February 25, 1999, a former client of Root's, Farideh Jalali, filed a malpractice suit against Root. Jalali did not, however, serve notice of the suit until after February 28, 1999, i.e., into the policy period of Root's subsequent insurer. However, on February 25, i.e., with three days left on the American Equity malpractice policy, someone at a "legal journal" apparently got wind of the suit, because Root received a phone call from a person who identified herself as an employee of a "legal journal." (The record does not say *which* legal journal it was.) The caller sought Root's reaction to the filing of Jalali's suit.

Root thought that the call was a "possible prank," and in any event thought the reporter's call was nothing more than mere "hearsay regarding a potential claim."[1]

As it would turn out, the Jalali malpractice suit arose out of a settlement of a discrimination case in which Root had obtained a whopping $2.75 million for his client. This court would later, in reversing a judgment for malpractice

---

[1] Here is the exact language from Root's declaration in opposition to the American Equity's eventual summary judgment motion: "Approximately one year later, on February 25, 1999, I received a telephone call from a person who identified herself as an employee of a legal journal who was seeking my reaction to the alleged filing of a lawsuit by Jalali accusing me of legal malpractice. At that time, I was a sole practitioner and I had never been sued by a client after more than 20 years of practicing law. I regarded the call as a possible prank and, in the middle of a typically busy day, did not immediately stop to think about when my professional liability policy expired, what its reporting requirements were, whether third party hearsay regarding a potential claim constituted a reportable event, or any of the other myriad implications of the call."

obtained by Jalali (and before this court was ever aware of the instant coverage case), hold that Root had done "a very good job." (See *Jalali v. Root* (2003) 109 Cal.App.4th 1768, 1773 [1 Cal.Rptr.3d 689].) As we showed in that opinion, Jalali didn't even attempt to argue that her underlying discrimination case was worth anything more than the $2.75 million Root had obtained for her. He had drained the case for all it was worth.

Root left for a weekend vacation on Saturday, February 27, returning Tuesday, March 2. On that day Root read an article in the same "legal journal" describing Jalali's lawsuit.

Apparently, the call wasn't a prank after all. Root *immediately* notified American Equity of the claim.

American Equity denied any coverage under the policy because Root had not reported the claim during the policy period. Root defended the Jalali claim on his own (his own firm representing him) and eventually sued American Equity for breach of contract, seeking, essentially, fees incurred in defending (ultimately successfully) the Jalali action. As it turned out later in this appeal, Root also notified his subsequent insurer of the Jalali action, but that insurer denied coverage on the theory that the reporter's telephone call gave Root had a "basis" to believe that his representation of Jalali would lead to a claim.

In the coverage litigation with his first insurer, American Equity obtained a summary judgment based on the lack of any report during the policy period. It is from that judgment that Root has brought this appeal.

### B. *The Contract Terms*

Now let us quote the relevant parts of the American Equity insurance contract. (Original boldface omitted, original capitalization modified to regular type.)

First, there is a notice on the cover page which concerns the need for a claim to be both made in and reported by the insured during the policy period: "This is a 'Claims Made' policy. The coverage afforded by this policy is limited to claims arising the from the performance of Professional Services which are first made against the Insured and reported in writing to the Company while the policy is in force. Please review the policy carefully and discuss the coverage thereunder with your insurance agent, broker or other representative."

Second, the insuring agreement, in pertinent part, obligates the insurer to indemnify the insured for "all sums in excess of the Deductible stated in the

Declarations which the Insured shall become legally obligated to pay as Damages as a result of claims first made against the insured during the policy period and reported in writing to the company during the policy period by reason of any act, error or omission . . . ." (This is set forth on ISO form LPL100-S.)

Third, there is a "claims" portion of the policy, which also addresses the time frame for reporting a claim—basically as "soon as practicable during the Policy Period." It reads: "As a condition precedent the Insured's right to the protection afforded by this insurance: [¶] (a) the Insured shall, as soon as practicable during the Policy Period, give to the Company written notice of any Claim against the Insured which might be covered hereby, together with the fullest information obtainable. If the Claim is made or suit is brought against the Insured, the Insured shall immediately forward to the Company every demand, notice, summons or other process received by him or his representative; and [¶] (b) if during the Policy Period the Insured shall first become aware of one or more specific acts, errors or omissions with respect to which no Claim has been made but which could reasonably be expected to form the basis of a Claim which might be covered hereby, the Insured shall, within the Policy Period, give the Company written notice of: [¶] (i) the specific act, error or omission; (ii) the injury or damage which has or may result from such act, error or omission; and (iii) the circumstance by which the Insured first became aware of such act, error or omission."

However, this notice requirement has an interesting clause following it, which provides that, in essence, a *report* to the company during the policy period will be deemed *a claim* even if no actual demand has yet been made on the insured: "If the insured strictly complies with the foregoing notice requirements, any Claim that may subsequently be made against the Insured arising out of such act, error or omission shall be deemed for the purposes of this insurance to have been made and reported in writing on the date such notice is received by the Company."

Next, there is the definition of "claim," which is quite short: "Claim means: [¶] a demand, including service of suit or institution of arbitration proceedings, for money against an Insured."

There is also an exclusion for claims arising out of prior acts under circumstances the insured was reasonably aware would "be expected" to be the basis of a claim: "This policy does not apply: . . . . [¶] To any of the following described claims arising out of any circumstance, act, error or omission occurring prior to the initial Company coverage date: . . . . [¶] (b) Any Claim against any Individual Insured who, on or before the Initial Company Coverage Date, knew, should reasonably have known, or had any

basis to believe that any such circumstance, act, error or omission might reasonably be expected to be the basis of a Claim."

Finally, we should take note of what the policy does not have—an extended reporting period endorsement. In fact, on the record before us, we must accept as true Root's declaration that American Equity never offered him the chance to buy such an endorsement.

An extended reporting period endorsement would have given Root a set amount of extra time to report claims—which would be useful in cases, such as his, where the insured learns of a claim under arguably ambiguous circumstances. In the reported cases, such extended periods have typically been for 60 days. (See *Gulf Ins. Co. v. Dolan, Fertig and Curtis* (Fla. 1983) 433 So.2d 512, 516 (*Dolan, Fertig*).)

## III. DISCUSSION

### A. *A Claim Was Made*

We first address the question of whether a "claim" was even made against Root during the American Equity policy period. Answer: for purposes of analyzing whether American Equity covered the Jalali lawsuit, yes.

■ The definition of "claim" in the policy is ambiguously open-ended. The policy doesn't say that the mere *filing* of a suit is *not* a claim. It merely says that a claim is a demand for money. But a suit, even an unserved suit, easily fits several of the definitions of "demand" as an ordinary person might think of the word demand. "The action or fact of demanding or claiming in legal form; a legal claim . . . . To ask for (a thing) with legal right or authority; to claim as something one is legally or rightfully entitled to." (4 Oxford English Dict. (2d ed. 1989) pp. 430, 431.) Thus reasonable insureds might very well deduce that the mere filing of a suit against them, even without their knowledge, is a "claim" under the policy.

■ But what about the problem that given the ambiguity of the word "claim"—possibly meaning both *filing* of a suit and *service* of a suit—there could be a situation in which an insured might have two "claims" against him or her based on just one malpractice suit? (And falling on either side of a policy expiration date, to boot.) The answer is, given the traditional rule that ambiguities in insurance policies are construed according to the reasonable expectations of the insured, it is the insurer, not the insured, who must bear the cost of that ambiguity. If that result seems too generous to insureds, one has only to contemplate the alternative: The insured could be whipsawed by an ambiguous definition of claim and a parallel requirement of reporting

anything which constitutes a reasonable "basis" to believe a claim is being made into having no coverage under policies on either side of a policy period expiration divide. Ambiguities in insurance contracts aren't supposed to work that way. (There is an upside on this point for insurers, though: The paying insurer on one side of the divide may have an equitable contribution action against the insurer on the other side.)

In his monumental article on reporting forfeitures in claims made and reported insurance policies, Professor Works has touched on the whipsaw that can occur where (like here) the word "claim" is ambiguously broad yet there is a tandem obligation on the insured's part to report claims even if there is only a "reasonable basis to believe" they will be made *in the future*: "And might not an insured who knows exactly what his claims-made-and-reported policy says and who conscientiously reports a suit against him on the same day he is served feel aggrieved to learn that the multiple-event 'claims-made-and-reported' trigger was not satisfied because a billing dispute or regulatory inquiry in an earlier year is deemed a 'claim' that was first made then but went unreported until the victim's suit against the insured prompted action?" (Works, *Excusing Nonoccurrence of Insurance Policy Conditions in Order to Avoid Disproportionate Forfeiture: Claims-Made Formats as a Test Case* (1999) 5 Conn. Ins. L.J. 505, 531.)

■ The point is, given the ambiguity in the word "claim," the word must be given an interpretation which favors the insured on both sides of the policy period divide, lest the insured be trapped by competing, but mutually exclusive, reporting triggers of "a basis to believe" versus "service of a suit." In fact, the insured has found himself in such a trap in this very case. Insurer number one denied coverage because the report was two days too late, while insurer number two (who is not in this case) denied coverage because the insured had a "basis to believe" a claim had been filed against him during the policy period of insurer one.

One might posit that the explicit mention of "service" of a suit as within the definition of "claim" would be at least a hint that mere filing of a suit isn't within the definition. The problem is, it remains only a hint. The insurer could not bring itself to unambiguously say something like, "Claim means: a demand for money against the insured, specifically and unambiguously brought to the insured's attention, including service of suit or institution of arbitration proceedings, and not including mere filing of a lawsuit."

This policy was hardly so assuring. The open-ended word "demand" carries the entire freight of the definition of "claim," leaving significant uncertainty to be resolved, as every underwriter should know, against the insurer.

Of course, in the more typical situation where a suit is filed and not served but (unlike here) the insured receives no information about it whatsoever during the policy period, the word "claim" should not be construed against the insured to preclude coverage, by either insurer number one or insurer number two. If insurers are going to define "claim" to possibly include events on either side of the expiration of a policy period, it is hardly unreasonable that insureds should get the benefit of the ambiguity in either direction. The alternative, as the very case before us illustrates, is a reading that could preclude coverage on *both* sides of the expiration date. Such a reading is obviously untenable under the rule that ambiguities in insurance policies are resolved according to the reasonable expectations of insureds.[2]

## B. *State of the Precedent*

As we will now show, there is much uncharted territory involving the problem of the "last minute claim" in a claims made and reported policy. The best guides we have are three currently surviving[3] California appellate cases which have considered the problem of reporting in the context of claims made, or claims made and reported policies: *Northwestern Title Security Co. v. Flack* (1970) 6 Cal.App.3d 134 [85 Cal.Rptr. 693] (*Flack*); *Pacific Employers Ins. Co. v. Superior Court* (1990) 221 Cal.App.3d 1348 [270 Cal.Rptr. 779] (*Pacific Employers*); and *Slater v. Lawyers' Mutual Ins. Co.* (1991) 227 Cal.App.3d 1415 [278 Cal.Rptr. 479] (*Slater*).[4]

---

[2] Another possible objection to a definition of "claim" that could include events on both sides of a policy expiration date (at least when it works in the insured's favor) is that such a definition runs contrary to the loss-in-progress rule, which requires that the event insured against be fortuitous. (See Ins. Code, § 22.) The answer is that we are looking at the policy's definition of claim, not some other reason to deny coverage. Moreover, the possibility of a loss-in-progress issue does not require that the word "claim" be construed as an exception to the rule that ambiguities are resolved according to the reasonable expectations of the insured. In cases where the insured has no knowledge of the filing of a suit against him or her, the insured could still reasonably believe that the filing of a suit met the policy's definition of the word "claim." (See *Montrose Chemical Corp. v. Admiral Ins. Co.* (1995) 10 Cal.4th 645, 691, 693 [42 Cal.Rptr.2d 324, 913 P.2d 878] [where existence and extent of injuries were unknown from insured's "standpoint," coverage, coverage of continuous or progressively deteriorating property damage under a commercial general liability policy did not offend loss-in-progress rule].) And in cases like the present one where the insured is presented with at least a possibility of a claim during the policy period, there is even less reason to use the loss-in-progress rule to construe the word "claim" against the insured.

[3] See Works, *Excusing Nonoccurrence of Insurance Policy Conditions in Order to Avoid Disproportionate Forfeiture: Claims-Made Formats as a Test Case, supra,* 5 Conn. Ins. L.J. at pages 539–540 (asserting that insurers engaged in concerted campaign to keep unfavorable decisions regarding reporting conditions in claims-made policies off the books, either by way of decertification or settlement); see also *Slater, supra,* 227 Cal.App.3d at pages 1427–1429 (dis. opn. of Johnson, J.) (same point).

[4] There is also this passage from the Croskey insurance treatise, which points out the danger of a "coverage gap" in certain extreme situations: "Most insurers now offer malpractice

Of these, the earliest, *Flack*, applied the notice-prejudice rule to affirm a judgment in favor of the insured (a title company) as against its malpractice insurers (a Lloyd's underwriter) who had issued a claims made policy. (See *Flack, supra*, 6 Cal.App.3d at pp. 143–144.) *Flack* would later be rejected as nonpersuasive by the court in *Pacific Employers*, which dismissed *Flack* as relying "solely on *Campbell* [*v. Allstate Ins. Co.* (1963) 60 Cal.2d 303 [32 Cal.Rptr. 827, 384 P.2d 155]], finding, without discussion, that the distinction between a 'claims made' insurance policy and an 'occurrence' policy did not require a departure from the ordinary application of the notice-prejudice rule." (*Pacific Employers, supra*, 221 Cal.App.3d at p. 1357.)[5]

■ While *Flack* wasn't quite so conclusory as *Pacific Employers* might lead one to believe,[6] we do not rely on it in this decision. For one thing, it involved a "claims made" as distinct from a "claims made and reported"

policies requiring that the claim both be first made against the insured and reported in writing to the insurer during the policy period. Such provisions have been upheld although they restrict coverage, particularly for 'last minute' claims. [Citations.] . . . . Disadvantages to Insured: A coverage gap may occur where the insured obtains successive 'claims made and reported' policies. If a claim is made against the insured during policy year one but not reported to the insurer until policy year two, there may be no coverage under either policy, even if issued by the same insurer!" (Croskey et al., Cal. Practice Guide: Insurance Litigation (The Rutter Group 2004) ¶¶ 7:2417–7:2417.1, p. 7K-4.) In light of this potential gap, the Croskey practice guide then advises "knowledgeable insureds (particularly larger firms)" to negotiate for simple claims-made coverage rather than claims made and reported coverage. (*Id.*, ¶ 7:2417.2, p. 7K-4.) The guide does not mention what practitioners, whether in "larger firms" or working solo, should do if simple claims made coverage is unavailable, or if (as in the present case), an extended reporting period endorsement is unavailable.

[5] *Campbell* is a case associated with the notice-prejudice rule. Third party claimants were rear-ended by the insured, who then skipped town and didn't communicate with his insurer. The claimants got a default judgment against the insured, and then brought an action against the insured's insurer pursuant to section 11580 of the Insurance Code, which gives injured parties, after having obtained a judgment against the insured, the right to sue the insured's insurers. In such a context, to allow the insurer to assert lack of cooperation—including late notice—as a defense would thwart the operation of the statute unless the insurer was "substantially prejudiced" by that lack of cooperation. (See *Campbell v. Allstate Ins. Co., supra*, 60 Cal.2d at pp. 305–306 and authorities cited.)

[6] To read *Pacific Employers*, you'd think that the *Flack* court simply said, "It makes no difference whether the insurance policy is claims made or occurrence, the notice-prejudice rule applies," cited to *Campbell* and left it at that. Not quite. The opinion was based not only on *Campbell*, but "on the other cases cited above" (see *Flack, supra*, 6 Cal.App.3d at p. 143), which enunciated a common law rule that notice-prejudice applied "to all cases in which the insurer asserts a defense based upon a breach by the insured of a cooperation or notice clause." (*Id.* at p. 144.) Those cases included *Billington v. Interinsurance Exchange* (1969) 71 Cal.2d 728 [79 Cal.Rptr. 326, 456 P.2d 982]; *Abrams v. American Fidelity & Cas. Co.* (1948) 32 Cal.2d 233 [195 P.2d 797]; *Valladao v. Fireman's Fund Indem. Co.* (1939) 13 Cal.2d 322 [89 P.2d 643]; *Purefoy v. Pacific Auto Indem. Exch.* (1935) 5 Cal.2d 81 [53 P.2d 155]; *Allstate Ins. Co. v. King* (1967) 252 Cal.App.2d 698 [60 Cal.Rptr. 892]; and *Hanover Insurance Co. v. Carroll* (1966) 241 Cal.App.2d 558 [50 Cal.Rptr. 704].

policy. For another, as we show at the end of this opinion, the notice-prejudice rule sweeps too broadly in the context of claims made and reported policies.

The actual holding of *Pacific Employers*, however, is not applicable to this case either. In *Pacific Employers*, the insured waited 11 months after becoming aware of the underlying claims before giving notice.[7]

The same may be said for *Slater*. There the insured was totally unaware of the claim until after the policy period had expired, and delayed giving notice to the insurer for more than three months after that.[8]

Even more importantly, there are two more important ways in which these cases are different from the one before us. First, the central focus of both *Pacific Employers* and *Slater* was whether the broad notice-prejudice rule could excuse the nonreport. The courts did not consider the less contractually intrusive common law involving the possible equitable excusal of conditions precedent when they work a forfeiture. (One does not find in these cases, for example, any references, citations or discussions about the Supreme Court's decision in *O'Morrow v. Borad* (1946) 27 Cal.2d 794 [167 P.2d 483], or about other cases involving conditions precedent and forfeitures.)

Second, (unlike the present case) in both cases the insured had been at least offered an extended reporting period endorsement (also known as a tail). The presence of at least the *opportunity* to purchase such an endorsement is important because that opportunity was integral to the *Slater* court's ultimate decision in favor of the insurer to the degree that the court faced the straight-on problem of whether denying coverage under the circumstances of that case was unfair. It wasn't unfair *because* the insured had had the opportunity to buy an extended reporting period endorsement. (See *Slater, supra*, 227 Cal.App.3d at p. 1424.)[9] In *Pacific Employers* the policy already had an extended reporting period endorsement and the insured still managed to miss the reporting deadline.

---

[7] In *Pacific Employers*, a new widow retained an attorney to represent her in the probate of her late husband's estate. The late husband was an insurance salesman who had a malpractice policy expiring March 15, 1983. The attorney, however, failed to give notice of various creditors' claims to her late husband's malpractice insurance carrier though he received notice of those claims in early 1983. Eventually another attorney gave notice to the malpractice carrier, but it was on February 15, 1984, which was 11 months after the policy had expired.

[8] The policy period in *Slater* expired April 15. While the insured was sued in late February (within the policy period), he was not served until July 1 and did not give notice until October 6. (See *Slater, supra*, 227 Cal.App.3d at p. 1418.)

[9] We are not here deciding that an offer to supply an extended reporting endorsement would preclude application of equitable relief against forfeiture in all cases.

The case closest on point of which we are aware is the Florida Supreme Court's decision in *Dolan, Fertig, supra,* 433 So.2d 512. While *Pacific Employers* is both factually off-point and did not consider the problem of conditions precedent and forfeitures, it did rely heavily on observations from *Dolan, Fertig* about the nature of claims made policies, so the case bears some extended exploration.

In *Dolan, Fertig,* the policyholder (a law firm) became aware of a claim on the day before the policy expired—November 19 in a case where the policy expired November 20. The firm then reported the claim to its subsequent insurer—the one who, to use the insurance industry expression, "came on the risk" after November 20. However, that subsequent insurer denied the claim in January, and it wasn't until mid-February (February 12 to be exact) that the law firm reported the claim to its initial insurer—the one "on the risk" until November 20. The coverage litigation with its initial insurer made its way to the Florida Supreme Court.

In the Florida Supreme Court, however, the law firm could not resist the temptation to swing for the bleachers—nothing so modest as the law of condition precedent and disproportionate forfeiture. The law firm, after all, had missed the reporting deadline by almost three months. So the law firm went for the broadest possible ruling from the Florida high court, going even beyond reliance on the notice-prejudice rule. The firm asked the Florida Supreme Court to "strike down all claims-made liability insurance policies as being inequitable agreements and thus in violation of public policy." (*Dolan, Fertig, supra,* 433 So.2d at p. 514.)

Rather than succeeding in having the court strike down all claims-made policies, the law firm struck out. Its position was rejected for basically the same reason the notice-prejudice rule would be rejected in *Pacific Employers*—the fundamental principle that courts ought not to be handing out insurance coverage for claims that the insurer never bargained to pay and the insured never paid premiums for. (Compare *Dolan Fertig, supra,* 433 So.2d at page 515 ["If a court were to allow an extension of reporting time after the end of the policy period, such is tantamount to an *extension of coverage* to the insured gratis, something for which the insurer has not bargained"] with *Pacific Employers, supra,* 221 Cal.App.3d at p. 1359 [quoting same language from *Dolan, Fertig*].)

But it also pays to read footnotes. If one only reads the text of the *Dolan, Fertig* opinion, one might gather the idea that even the tiniest, slightest extra time to report a claim after the policy period had expired was absolutely, 100 percent, never a possibility under a claims made and reported policy. (See *Dolan, Fertig, supra,* 433 So.2d at p. 515.) The *Dolan, Fertig* court was,

however, not willing to go that far. In fact, when confronted with the hard hypothetical situation of a very, very late claim, made minutes before the expiration of the policy, posed by the intermediate Florida Court of Appeal, the Florida Supreme Court wilted. It could not bring itself to say that there was no possibility that a late claim might ever be excused:

"The district court posed the following factual situation: [¶] A time comes at the end of the policy period when it may . . . be *impossible* for the insured to notify the company of a claim. The extreme case would involve the receipt of a claim by the insured minutes before the midnight expiration of the term on the last day thereof. [Citation to appellate court's opinion.] Without deciding the issue at this time, we believe that under the circumstances a 'reasonable time' would not be germane to a claims-made contract; instead, if an impossibility prevented notice being given to an insurer at the very end of the policy period, it may well be that an insured would be relieved of giving notice during the period of such impossibility. In most instances, this would be measurably shorter than a 'reasonable' period of time. That issue is not before us, however, and we decline to fully address it." (*Dolan, Fertig, supra,* 433 So.2d at p. 516, fn. 1.)

We need only note that the *Dolan, Fertig* court did not need to address the problem of the extremely late claim, because the notice that was ultimately tendered to the first insurer was late by about three months. Moreover, as in *Slater* (but not the case before us), the insured law firm had been given the opportunity to purchase a 60-day "tail," which itself would have alleviated the late-claim hypothetical. (See *Dolan, Fertig, supra,* 433 So.2d at p. 516.)[10]

We are thus aware of no case, such as the one before us, where the late report was made a de minimis time after the expiration of the policy and where the insured had not been given the opportunity to be protected under an extended claim reporting endorsement.

### C. *The Law of Conditions Precedent and Disproportionate Forfeitures*

#### 1. General Considerations

California's common law of contracts has traditionally allowed for the equitable excusal or remediation of nonoccurrence of conditions precedent in contracts when such nonoccurrence works a forfeiture. (See *Ebbert v. Mercantile Trust Co.* (1931) 213 Cal. 496 [2 P.2d 776];[11] *Hopkins v.*

---

[10] But see footnote 9, *ante.*

[11] In *Ebbert*, the high court reversed a judgment which would have cancelled a note. The plaintiffs were buyers who had purchased 10 acres of land, and the land was to be planted with

*Woodward* (1932) 216 Cal. 619 [15 P.2d 499];[12] *Henck v. Lake Hemet Water Co.* (1937) 9 Cal.2d 136 [69 P.2d 849].)[13] There is also a statutory basis for an antiforfeiture rule in section 3275 of the Civil Code: "Whenever, by the terms of an obligation, a party thereto incurs a forfeiture, or a loss in the nature of a forfeiture, by reason of his failure to comply with its provisions, he may be relieved therefrom, upon making full compensation to the other party, except in case of a grossly negligent, willful, or fraudulent breach of duty." And in fact the *Henck* case expressly relied on section 3275 to excuse the condition in that case.

---

fig trees and tended to by the seller, with the buyers to receive credit for half the proceeds of the crops. The note had a provision that if the seller failed to "carry out any and all parts of" its terms, after 90 days written notice, the note would become null and void. (*Ebbert v. Mercantile Trust Co., supra*, 213 Cal. at p. 498.) Apparently there was a failure of terms (alas, the opinion does not specify the nature of that failure), so the buyers sought cancellation of their debt. The seller's answer asserted that it would compensate the buyers for all losses actually sustained and that the buyers should "do equity." (*Id.* at p. 500.) The high court agreed. The court said that the notes and deeds of trust should not be cancelled unless the buyers reimbursed the defendants for the reasonable value of benefit "already conferred by their part performance," or alternatively, the notes could remain as binding if the seller compensated the buyers for the partial failure of performance. (*Id.* at p. 501.)

[12] In *Hopkins*, a producer promised to open a play in Los Angeles or San Francisco by August 5, 1929, and the contract provided for the termination of the producer's right to put on the play if he didn't "full comply" (court's phrase, not the contract's) with its terms. The male lead was in a car accident, hence, as the court noted, the failure to open the play on time "was attributable to circumstances wholly beyond his control." (*Hopkins v. Woodward, supra*, 216 Cal. at p. 621.) Moreover, the court was even willing to indulge in the presumption that the actor's injuries were not so bad as to prevent the opening or that a substitute might have been obtained, i.e., that the delay was not the result of an " 'irresistible, superhuman cause' " under section 1511 of the Civil Code. Even so, said the court, "to terminate the contract, as plaintiff would have us do, would result in a loss to the defendant [producer] 'in the nature of a forfeiture.' " (*Hopkins, supra,* at p. 622.) Termination would be, under the circumstances, "inequitable and oppressive." (*Ibid.*) And that would be particularly true given that any loss from the lateness could be "adequately compensated in damages." (*Ibid.*)

[13] In *Henck*, a water supply contract clearly said that timely payment of the yearly bill was a "condition precedent" of the right to receive water. One year, the company didn't send a notice that the bill was due, the buyer didn't pay on time, and the company declared the contract terminated. Said the court: "If the breach of such a condition works a forfeiture, equity in a proper case may grant relief." (*Henck v. Lake Hemet Water Co., supra*, 9 Cal.2d at p. 142.) The court also considered a time-is-of-the-essence rule, with the company arguing that time was indeed made of the essence in the contract, even though the contract didn't use the phrase "time is of the essence." The court recognized the general rule that "generally in a case where time is made the essence of the agreement a party may not obtain relief under" section 3275. However, the "general rule of equity is that time is not of the essence of the contract, unless it clearly appear from the terms of the contract, in light of all the circumstances, that such was the intention of the parties." (*Henck, supra,* 9 Cal.2d at p. 143.) Because "the time element" was "a means to insure prompt payment rather than as an indication that failure to perform at the time stipulated would result in an immediate termination and forfeiture of the plaintiff's rights." (*Id.* at p. 144.)

The reference in section 3275 to relief conditioned on "making full compensation to the other party" may, at first blush, seem to preclude insurance contracts from condition-precedent-forfeiture analysis. Insurance contracts are, to use the technical term, "aleatory." That is, they are contracts where there is the possibility that one party (the insurer) will never have to make good on its promise. Indeed, both parties actually hope that the one party will never have to make good on its promise. You pay your auto insurance premium hoping that you will never have an accident and the insurer will never have to make good on its promise to indemnify you for it.

This aleatory nature of insurance contracts makes an allowance of "full compensation" impossible when it comes to the *fundamental risk* insured against. It is common knowledge that if you have already had a car accident at a time when your policy has long since expired, you can't simply go back and pay the premiums so that the insurer will be obligated to compensate you for your wrecked car.

█ But the aleatory nature of insurance contracts does not make compensation an impossibility when it comes to conditions precedent to coverage. We already know this from the great body of case law which (at least outside of claims made and reported policies) has imposed the notice-prejudice rule on insurers. (See cases mentioned in footnote 6, *ante*). If notice of a claim is a *condition* of coverage, then it can be excused when it works a forfeiture.

Proof of this point may be found in *O'Morrow v. Borad, supra,* 27 Cal.2d 794, where our Supreme Court made it clear that conditions in insurance policies could be excused under traditional contract forfeiture rules. In *O'Morrow*, the policyholder was in an auto accident with another motorist insured by the same insurers. The other motorist filed a complaint, and the policyholder went out and got his own attorney to prosecute a cross-complaint. The policyholder also refused to let his insurers defend the original complaint on his behalf—it was, after all, a clear conflict of interest. The *insurers'* interest was not only in defeating the original complaint against the policyholder, but also in defeating the policyholder's own cross-complaint.

█ The refusal, however, was a breach of the cooperation clause in the policy, which gave the insurers the right to defend actions against the policyholder. But did this refusal excuse the insurers from having to pay any judgment the other motorist might obtain? No. After a brief passage in which the *O'Morrow* court basically said that it didn't care whether the cooperation clause was a condition subsequent or condition precedent, the court ended with the point that even if the usual rules of interpretation could not avoid a forfeiture, a court could still excuse compliance with the condition or give

equitable relief against its enforcement: "Forfeitures, however, are not fa-vored; hence a contract, and conditions in a contract, will if possible be construed to avoid forfeiture. [Citations.] This is particularly true of insurance contracts. [Citation.] [¶] And where, as in the insurance policies held by O'Morrow, the condition is express and cannot be avoided by construction, the court may, in a proper case, excuse compliance with it or give equitable relief against its enforcement." (*O'Morrow v. Borad, supra,* 27 Cal.2d at p. 800.)

The Supreme Court then administered the coup de grâce. To relieve the insurers under the circumstances of the case would be "most inequitable," because the situation arose from their own extensive operations. "Under these circumstances, compliance with the cooperation clauses is excused and the insurers are liable for any judgment . . . ." (*O'Morrow v. Borad, supra,* 27 Cal.2d at p. 801.)

### 2. A Condition by Any Other Name . . . .

#### a. *The Problem*

The central issue in this case, then, is whether the policy period reporting requirement is a condition precedent of coverage that may be equitably excused when it works a forfeiture. The complicating factor is that the reporting requirement here is found in the insuring clause, and therefore at least *looks* as if it is an element of the defining scope of coverage rather than just a mere "condition."

The issue came up in *Slater,* where the majority rejected the notice-prejudice rule precisely because of the inclusion of the reporting requirement in the insuring clause. But that point met stiff resistance from the dissenting justice, who argued that there is "no magic about where the reporting requirement is placed within an insurance contract." (See *Slater, supra,* 227 Cal.App.3d at p. 1429 (dis. opn. of Johnson, J.).) Justice Johnson went on to argue that, functionally, it should make no difference where the reporting requirement is placed in the contract because no coverage is still no coverage, whether as the result of the insuring clause, an exclusion, or a condition.

■ In the case before us we need not and do not go as far as Justice Johnson's dissent might take us. There *are* well-established differences between insuring clauses, exclusions, and conditions that should not be amalgamated into one binary question: coverage yes or no under an "if . . . then" analysis. (See cases collected in *American Star Ins. Co. v. Insurance Co. of the West* (1991) 232 Cal.App.3d 1320, 1325 [284 Cal.Rptr. 45].)

That said, Justice Johnson certainly had a valid point that *just because* something is mentioned in an insuring clause does not *necessarily* mean that it goes to the scope of basic coverage provided by the insurance policy. Justice Johnson cited the reductio ad absurdum of an insuring clause that was one long run-on sentence encompassing all the terms of the policy. (See *Slater, supra,* 227 Cal.App.3d at p. 1430 (dis. opn. of Johnson, J.) ["if placing a policy limitation in the 'definitions' clause or the 'coverage' clause rendered it immune from equitable constraints like the 'notice-prejudice' rule, one could expect a rash of single clause insurance contracts—long, long, long clauses, I hasten to add—in which were packed all the exclusions, conditions, requirements, and the like which now are spread over the many paragraphs of the typical insurance contract"].) As we will now show, the reporting condition in Root's policy here does *not* go to basic coverage but quacks, walks, looks and functions like a condition, not an element of the fundamental risk insured.

### b. *As a Matter of Textual Exegesis*

The first reason to conclude that the policy period reporting requirement is a condition is simple. The policy tells us it is.

Besides being in the insuring clause, the reporting condition is also repeated in the "claims" section of the policy: "*As a condition precedent* the Insured's right to the protection afforded by this insurance: [¶] (a) the Insured shall, as soon as practicable *during the Policy Period,* give to the Company written notice of any Claim against the Insured which might be covered hereby, together with the fullest information obtainable." (Italics added.)

It might be supposed that this particular language is a separate reporting condition, i.e., there is a reporting requirement as an element of coverage in the insuring clause which operates without regard to a need to give notice "as soon as practicable" and another, separate reporting requirement which is contained in the conditions section of the policy which makes the need to report "as soon as practicable" a condition of coverage. The problem with that line of reasoning, though, is that at least insofar as the policy seeks to put the onus on the insured to report a claim during the policy period, the two reporting requirements are identical. And by making the identical need to report during the policy period part of the insuring clause and an express condition, the policy becomes ambiguous (in fact, practically enigmatic!) as to whether the requirement to report during the policy period is an element of coverage, a condition, or both. One of the alternative interpretations of that ambiguity is that there is really one requirement to report during the policy period, announced in the insuring clause and further delineated in the conditions, and that one basic requirement is indeed a condition. Superfluity does not vitiate, and in fact there are occasions when it defines.

### c. *As a Matter of Commercial Reality*

But even if the policy did not contain the seeds of its own cognitive dissonance on the problem of whether the policy period reporting requirement is an element of coverage or condition, an examination of the commercial reality behind the reporting requirement provides ample proof that it is, fundamentally, a condition.

To do that, we must first examine the reason why insurers changed from "occurrence" to "claims made" (and then "claims made and reported") policies in the first place. It is a little more complex than it has been made out in some of the cases.

The key is the pricing of premiums. The core idea behind the move to claims made insurance policies was to *close the gap* between the time when the insurer *prices* a risk and the time when the insurer may incur an obligation to *pay on* that risk. (See Works, *Excusing Nonoccurrence of Insurance Policy Conditions in Order to Avoid Disproportionate Forfeiture: Claims-Made Formats as a Test Case, supra,* 5 Conn. Ins. L.J. at p. 516 ["Other things being equal, the insurer's financial people will want to employ a policy trigger that falls later in the sequence than earlier, in order to shorten the time between when a policy obligation is priced and when the extent of the obligation is determined. Statistical models of insurance pools that help inform insurance underwriting and pricing decisions depend in part on the quality of the loss frequency and severity estimations they employ. Consequently, the longer the period for which one must 'develop' immature historical loss data in order to estimate ultimate loss costs for policies written in the past, and the longer into the future one must peer in an effort to trend those estimates of past loss costs in order to make predictions abut future loss costs for new policies, the greater the likelihood for error."].)

On reflection, of course, the idea of closing the pricing gap is unremarkable. Pretty much everybody who has the slightest acquaintance with insurance law knows that the longer the gap between the time the insurer takes the premiums and the time when the insurer pays out on the risk, the more likely the insurer is to get burned. (See *Pacific Employers, supra,* 221 Cal.App.3d at p. 1358 ["In an effort to reduce their exposure to an unpredictable and lengthy 'tail' of lawsuits filed years after the occurrence they agreed to protect against, underwriters shifted to the 'claims made' policy."].) Insurers, like all businesses in a free market, have the fundamental problem of making decisions now that depend on future events, and their survival depends on guessing right often enough to be profitable.

Perhaps the most striking example of insurers charging low premiums to insure against occurrences that would later come back to cost them dearly has been in the area of pollution liability and toxic torts, where claims were made in the 1980's and 1990's against policies which were priced in the 1950's and 1960's (see, e.g., *Aerojet-General Corp. v. Transport Indemnity Co.* (1997) 17 Cal.4th 38, 46–47 [70 Cal.Rptr.2d 118, 948 P.2d 909] [pollution claims brought in late 1970's and early 1980's involved policies "incepting as early as 1950"]; *Dart Industries, Inc. v. Commercial Union Ins. Co.* (2002) 28 Cal.4th 1059 [124 Cal.Rptr.2d 142, 52 P.3d 79] [toxic drug claims made against drug company from 1970's onward involved policies going back as early as 1946].)

Professional malpractice insurance underwriting is likewise particularly vulnerable to gaps between the time of pricing and the time of obligation. (See *Pacific Employers, supra,* 221 Cal.App.3d at p. 1358 ["Underwriters soon realized, however, that 'occurrence' policies were unrealistic in the context of professional malpractice because the injury and the negligence that caused it were often not discoverable until years after the delictual act or omission."].)

From the foregoing, we can deduce that the length of time between premium pricing and the surfacing of insurer obligation to pay can become a risk in itself. Now, with traditional "occurrence" policies, the risk of a claim surfacing at some future date after the policy period has expired is borne by the insurer. With pure "claims made" policies, that risk is shifted to the insured, who pays present dollars for protection against claims that will themselves be paid in those same dollars, that is, without regard to inflation and at a time relatively close to the insurer's pricing decision. There is no disproportion, as there can be in occurrence policies, between premiums paid to the insurer and outgo from the insurer.

But what *risk*, we must ask, does the addition of the reporting requirement in claims made and reported policies actually shift from the insurer to the insured? The basic risk of the late-surfacing claim—whether surfacing two days or 20 years after the policy period has expired—has already been addressed by going to claims made coverage. Since the claim must still be

made during the policy period, and the prosecution of that claim is independent of any report of it by the insured to the insurer,[14] no additional pricing risk is shifted by the reporting requirement.

So what is shifted by the reporting requirement? Two things.

The first, and most important, is the administrative convenience of *monitoring* potential payouts. In a word, a reporting requirement gives the insurer administrative "closure" and that is surely worth something, at least to the insurer, which is passed on to the insured in the form of lower premiums. Anyone who has ever dealt with insurers and their claims adjusters knows that they tend to put at least a little value on simply being able to close a file. Perhaps more importantly, a policy period reporting requirement facilitates the quicker accumulation of loss history. By the end of the policy period the insurer definitely knows whether X risk generated any claims in Y period, and it knows it quicker (but only slightly quicker) with a claims made and reported policy than it knows it with a pure claims made policy. (However, even this bit of information is of only limited value: While the reporting requirement means that the insurer may know *whether* any claims were filed, it is unlikely to know *how much* it will have to pay out on any late made but timely reported claims.)

The second shift is the risk of claims which would—and this is important—*otherwise* be within the scope of basic coverage of the policy, but which the insurer need not pay because of an action the *insured* does not take. As such, it operates as a simple forfeiture clause: Don't report in the policy period, and lose coverage you otherwise would have had.

It should be apparent that considered either way—either as a shift of administrative monitoring costs or as a naked forfeiture clause—the reporting requirement functions as a condition precedent to coverage, not as a definition of coverage. Put it this way: Assuming timely report by the insured, the risk borne by the insurer on the insured's behalf is exactly the same as in pure claims made coverage. The addition of a reporting requirement therefore doesn't go to risk of a claim against the insured (i.e., what sort of claim

---

[14] Thus, for example, suppose, as happened in *Slater*, that a suit is filed against the insured during the policy period but not served (and the insured has no knowledge of the suit otherwise) until well after the policy period has expired. And then the malpractice suit is prosecuted, in due course. Note that the *pricing risk* which engendered the move to claims made policies in the first place is no different whether the policy is written on a pure claims made or a claims made and reported basis. The report has no effect on what the insurer would ordinarily pay out in the normal course of the prosecution of the claim.

might fall within the ambit of the costs the insurer promises to cover), but to the logically independent risk that the insured simply will not report the claim in time.

### 3. The Equitable Excuse of a Condition Is Not Adoption of the Notice-prejudice Rule

The general rule stated in *O'Morrow* is an equitable one, which basically allows the court to excuse a condition when it results in a forfeiture. We must now hasten to add that this mere possibility is considerably different from the notice-prejudice rule which the courts rejected in *Pacific Employers*, *Slater* and *Dolan, Fertig*.

The notice-prejudice rule is, ironically enough, a fairly inflexible instrument. Prejudice is hard to show under the rule. In the *Flack* case, for example, the court read *Campbell v. Allstate*, *supra*, 60 Cal.2d 303, for the proposition that the burden is on the insurer to show that it has been prejudiced by any delay, and further that mere passage of time does not even establish a presumption or inference of prejudice. (See *Flack, supra*, 60 Cal.2d at pp. 696–697.) Thus even though the insurer claimed that it had been deprived of the chance to settle a case for a small sum early in the proceedings, or of having its own counsel represent it, that was not enough. (See *id.* at pp. 697–698.)

Given that inflexibility, it is no wonder why *Pacific Employers*, *Slater* and the earlier *Dolan, Fertig* courts were loathe to agree with the insureds that the notice-prejudice rule could be applied to the case. To do so would have effectively obliterated the "and reported" part of the "claims made and reported" policy. Indeed, if one had to sum up in one sentence why the insured lost in both *Pacific Employers* and *Slater* it would go something like this: To apply the notice-prejudice rule to a claims made and reported policy would have been to convert that policy into a pure claims made policy, and therefore give the insured a better policy than he paid for.

We agree with that analysis. *Pacific Employers* and *Slater* are perfectly sound in their resistance to the notice-prejudice rule for claims made and reported policies. Consider the inflexible breadth of the notice-prejudice rule: It can apply to cases involving delays many months, perhaps even years, after the expiration of the policy period, and it puts the burden on the insurer to show prejudice from even long delays in reporting. Application of the rule thus fundamentally rewrites the claims made and reported contract into a pure claims made contract.

But the possible equitable excuse of a condition precedent is much more flexible and nuanced, and does no violence to the claims made and reported nature of the policy.

■ First of all, it is not a bright-line test. Equities vary with the peculiar facts of each case. Sometimes—indeed most of the time—it will not be equitable to excuse the nonoccurrence of the condition, so it is not excused. Granted, the factually intense nature of the inquiry may make summary judgment more difficult for insurers to obtain in certain cases (like this one), but that is a result that comes with California's common law rule that conditions can be excused if equity requires it.

■ For example, in the present case, the fact that the insurer did not give the insured the opportunity to buy an extended reporting endorsement which would (if it was anything like the ones in the reported cases) have given him an extra 60 days to report any claims may be of significance. Had Root been given that opportunity, for example, equity might not require excuse of the condition, because its excuse would, in effect, be to give Root the benefit of something that he had the opportunity to buy and passed up. The same might be said if Root had had sufficient time to conduct an investigation as to whether a claim had indeed been made against him,[15] or had delayed reporting the claim beyond the day on which he received confirmation of the claim. But given this record the facts are sufficient to support the equitable excuse of the reporting condition, so summary judgment should not have been granted. In the *O'Morrow* court's phrase, given these facts it would be "most inequitable" to enforce the condition precedent of a report during the policy period.

---

[15] For example, the question arises: Why couldn't Root, on the Thursday when he received the call ostensibly from a reporter at a legal journal, have simply faxed or emailed what he had learned, and easily protected himself? The answer is that Root didn't learn of "the claim" that Thursday; at most he learned of the *possibility* of a claim against him in a case where he had every objective reason to think there would be no claim. Given that circumstance, Root was not free simply to report the claim to his insurer on the theory that it would do no harm to make the report. It might very well have harmed him to make such a report. To do so would have been to prejudice his chances of being able to report the claim to his second insurer. By making a report in the policy period of insurer one, most lawyers know that insurer two will pounce on the fact of that report to argue that the claim did not occur in its policy period. (As it turned out, though, his forbearance ultimately didn't do him any good.) The point is, given information that only raises a bare possibility of a claim, an insured must do some investigating. And here, while it may not have been impracticable to simply fax over notice to American Equity, it surely was impracticable, during the last two business days remaining on the policy, to investigate whether Jalali had, indeed, sued him. Depending on the court, for example, even sending over an attorney service to obtain a copy of the complaint might not work. Clerks records might not be up to the latest minute and a copy of the complaint might be readily obtainable. Moreover, since we are dealing with a case that proceeds from a summary judgment motion, all reasonable inferences must be resolved in favor of the responding party, including the inference that any investigation necessary to ascertain whether there really was a claim against him could not have been completed by the close of business Friday.

## IV. DISPOSITION

The judgment is reversed with directions for the trial court to conduct further proceedings not inconsistent with this opinion.

Since our decision today is essentially interlocutory, the trial court shall have discretion to award the costs of this appellate proceeding to the ultimately prevailing party, or to decide that each party shall bear its own.

Rylaarsdam, J., and O'Leary, J., concurred.