[No. A122307. First Dist., Div. Four. Sept. 18, 2009.]

A.M., Plaintiff and Respondent, v.
ALBERTSONS, LLC, Defendant and Appellant.

**[CERTIFIED FOR PARTIAL PUBLICATION\*]**

*The opinion is certified for publication with the exception of part III.B.

456

COUNSEL

Epstein Becker & Green, Steven R. Blackburn and Leslie J. Mann for Defendant and Appellant.

Boxer & Gerson, Leslie F. Levy, Jean K. Hyams; Law Offices of Ellen Lake and Ellen Lake for Plaintiff and Respondent.

## OPINION

**REARDON, J.**—A jury found that employer Albertsons, LLC,[1] had violated employee A.M.'s rights under the California Fair Employment and Housing Act (FEHA; Gov. Code, § 12900 et seq.) and awarded her $200,000 in damages. (Gov. Code,[2] §§ 12900–12996.) Albertsons appeals, contending that (1) its motion for nonsuit should have been granted because there was no actionable failure to accommodate A.M.; (2) the trial court erred by refusing related proposed jury instructions; and (3) the trial court erred by instructing the jury that A.M. did not bear the burden of proof that she was unusually susceptible to emotional distress injuries. We affirm the judgment.

## I. FACTS

### A. *Incident*

In 1981, at age 23, respondent A.M. left her home in El Salvador after civil war broke out there. She came to live in the United States. In 1987, she began working for appellant Albertsons doing various types of work. In 1999, she began working in the Fairfax store. By January 2003, she was either working in the meat and deli department or she was checking.

In January 2003, A.M. was off work on medical leave because she had been diagnosed with cancer of the tonsils and larynx. She underwent chemotherapy and radiation treatment. The treatment affected her salivary glands, which left her mouth very dry. To counter this, A.M. had to constantly drink water. As a result of the large volumes of water she consumes, she has to go to the bathroom to urinate frequently.

A.M. returned to work at the Fairfax store in January 2004, after her cancer treatment. She needed to have water with her at all times when she was working and had to be able to go to the bathroom when necessary— sometimes as often as every 45 minutes. Normally, Albertsons did not allow its employees to have beverages at the checkstand, but when she returned to work, she told the managers what she needed. A.M. was told that this was not a problem, that she was to let the managers know when she needed to go to the bathroom and they would cover for her. From January 2004 until February 11, 2005, when A.M. was working at a checkstand and needed to use the bathroom, she asked a coworker to take her place.

In February 2005, Kellie Sampson began working at A.M.'s Fairfax store. Sampson was the person in charge of store operations when more senior

---

[1] Save Mart Supermarkets is the successor in interest to Albertsons. For clarity, we continue to refer to appellant as Albertsons.

[2] All further statutory references are to the Government Code.

managers were not present. On February 11, 2005, A.M. worked a shift that began at 1:00 p.m. and went until 10:00 p.m. By 7:00 p.m., only three employees were left in the store—A.M., the checker, Britney Hollis, the courtesy clerk and Sampson, the person in charge.

Albertsons's policy was that a checker could never leave the front end of the store unattended. A courtesy clerk like Hollis was not allowed to operate a register. She could not relieve A.M. at the checkstand—only Sampson could do that. Sampson had never worked with A.M. before. There was no evidence that she had knowledge of A.M.'s disability or the accommodation that had been granted by the store managers.

About 8:00 p.m., A.M. saw Sampson and told her that she needed to take a break. She did not mention needing to use the bathroom. A delivery truck was arriving, so Sampson asked A.M. if she could wait. A.M. agreed to do so.

A while later, A.M. had a line of customers waiting for her at her checkstand. She called Sampson on the store intercom to say that she needed to go to the bathroom. Sampson explained that she was unable to relieve her because she was unloading merchandise. She told A.M. that she would have to wait. By this time, A.M. felt that she really needed to go.

Seven to 10 minutes later,[3] A.M. still had customers waiting for her to check them out. She called Sampson on the intercom again, explaining that she really needed to go. Again, Sampson said that she was busy and unable to come to the front of the store. A.M. said that she was going to go. Sampson did not give her permission to leave her checkstand—she just hung up the phone.

Unable to control herself, A.M. urinated while standing at the checkstand. She was having her menstrual cycle, so she was very wet with both urine and blood. She felt shaky and humiliated, even though she did not think that the customers saw that she had urinated on herself. A.M. told Hollis what had happened, instructing the courtesy clerk to find Sampson and tell her that A.M. needed her. When Hollis returned, she reported that Sampson said that she was still busy and that A.M. had to wait.

When Sampson finally went to the front of the store, she asked if A.M. was taking her break. A.M. told her no, that she was going home. A.M. left the checkstand and walked into the bathroom to clean herself. Sobbing, she called her husband to tell him what had happened, changed into oversize pants that Hollis had found for her and left the store.

---

[3] Sampson testified that the second call came 20 minutes after the first.

A.M. was crying, and when a customer asked what was wrong, A.M. explained that she had wet herself because no one let her go to the bathroom. The customer walked her to her car and stayed with her for a while. A.M. was becoming more agitated. She called her union representative, then started to drive home. Crying more and more, A.M. tried to make sense of what had happened. On the freeway, she felt that she did not count. She was reluctant to go home so filthy and smelling so badly. A.M. thought about killing herself, but she made it home without acting on those thoughts.

Once she got home, A.M. was still nervous, crying and sobbing. She took a long shower with very hot water, trying to scrub the smell off of her. She did not leave the shower until her husband removed her from it. She slept badly that night, going over and over in her mind what had happened and why someone would treat her so badly—worse than an animal. The next day, she was withdrawn and depressed, in marked contrast to the positive and joyous person that she usually was. She went to see a doctor, who gave her some medication to help her sleep and a written excuse not to go to work. A.M. made a second visit to the doctor after her husband feared that she was not well. She received another doctor's excuse not to go to work.

Over the next two months, A.M. continued to be listless and withdrawn, keeping to herself. She did not want to see her family or friends—she just wanted to be left alone. She feared that people would be able to smell the bad odor she sensed about herself. At night, A.M. continued to have crazy dreams and was unable to sleep well. Each day, she took multiple showers to try to remove any bad smells from her body. She shaved off all her body hair, hoping that the bad smell would go away.

Eventually, A.M. told a doctor that she had thought about killing herself. She was committed to a psychiatric hospital for several days. This was a frightening experience for her and she was depressed there. In a few days, she was released to go home. She began receiving individual and group therapy. She also attended workshops on depression and anxiety. She wanted to be left alone and she kept smelling blood and urine, even after other people assured her that she did not smell bad.

Soon after the February 2005 incident, Sampson left her employment with Albertsons. A.M. tried returning to work in May 2005, but the store was unable to offer her a schedule that allowed her to continue to attend therapy meetings—a condition of her return to work. In June 2005, A.M.'s brother died unexpectedly. She had been close to him and his death made her very sad. A.M.'s bad dreams continued through this period. She was given medication to help her sleep better, but she slept so deeply that she wet the bed. She attended therapy sessions, where she learned that her dreams were not necessarily real.

A.M.'s doctor extended the time she could be off of work because she was grieving for her brother. Her return to work was conditioned on being able to attend classes twice a week, being assigned to the day shift to make it easier to use the restroom, and not being assigned to work with Sampson. Eventually, she took fewer showers and she began to be less concerned about her smell. Still, she was withdrawn—much less enthusiastic and gleeful, much less likely to enjoy family gatherings than she had been before the incident.

When A.M. was able to return to work, she found the people in charge of her store were unwilling to work with her. She had trouble getting a shift that she needed in order to be able to attend her therapy sessions. The store was not certain that it could accommodate her. Eventually, she did return to work at an Albertsons store. At the time of trial, A.M. regularly received bathroom breaks at the store whenever she asked for them.

### B. *Lawsuit and Trial*

In September 2006, A.M. filed a complaint for damages, alleging a cause of action for failure to provide her with reasonable accommodations for her disability.[4] Albertsons sought to bifurcate the liability and damages issues of the trial. A.M. opposed this motion and the trial court denied it. In May 2008, A.M. filed a first amended complaint, alleging two causes of action in violation of the FEHA—one for failure to provide reasonable accommodation in February 2005 and one for failure to engage in the interactive process during the summer of 2005 when she tried to return to work.

At trial, the jury heard evidence of Albertsons's five-step procedure for providing reasonable accommodations to its disabled employees. The steps were an employee request for a reasonable accommodation for his or her disability; collection of information to document the need for a reasonable accommodation; a meeting between the employee and the human resources department; a decision on the request; and a communication from the company to the employee of that decision. Once this interactive process is completed, the parties arrived at the reasonable accommodation to be used. There was no evidence that the company's five-step procedure was used in A.M.'s case.

---

[4] The parties failed to include a copy of any complaint in their appendices. In a related appeal, we found a copy of the September 2006 complaint. On our own motion, we obtained a copy of the May 2008 first amended complaint.

Albertsons had a written procedure for processing employee requests for reasonable accommodation. Decisions about reasonable accommodation requests were made by Albertsons's human resources managers for the Northern California district, not by individual store managers. The human resources manager would notify the employee and the store manager if an accommodation was granted.

When Albertsons granted a reasonable accommodation, it was not always documented. Store managers could change over the course of time. Given the transient nature of store management, written documentation of reasonable accommodations was seen as critical. If a store manager granted an ongoing accommodation to an employee, a record of that may have been made to pass along to a new manager, but sometimes no record was made. Albertsons's policy offered a template to document the granting of a reasonable accommodation, but it was not used in A.M.'s case.

The jury also heard A.M. testify that when she arranged her accommodation with her store managers, she was not told to talk with company human resources officials about it, nor was she asked for any medical documentation of her need. On the night of the incident, A.M. did not explain to Sampson that she had a disability, or that Albertsons had always accommodated her disability by allowing her to go to the bathroom. She did not think that it was necessary to do so, assuming that management had told Sampson already.

Apparently, Sampson did not know about A.M.'s disability or the store's accommodation. This was consistent with the testimony of others who were left in charge of the Fairfax store and were not told by store management that A.M. might need to use the bathroom and might need to be relieved to be allowed to do so. After the second call from A.M. requesting a bathroom break, Sampson assumed that A.M. was going to go to the restroom.

Finally, the jury heard evidence of A.M.'s susceptibility to emotional distress. Her father was abusive and frequently intoxicated. She grew up in El Salvador during a period of civil war. A.M. saw people who had been killed in the war. Her cancer diagnosis and treatment were difficult and stressful. She had been robbed at gunpoint and had been physically assaulted. A.M. had also been in a car accident, which made her anxious when she drove. She attended counseling to help her handle these stresses. She had a prior history of depression. The incident at work led to depression, sleeplessness, an obsession with cleanliness and thoughts of suicide. Her brother's death only made matters worse.

An expert in psychological injury and treatment told the jury that A.M. suffered from posttraumatic stress disorder. Those who suffer from this

disorder reexperience events from their past. For example, for months after February 2005, A.M. could smell blood and urine when no one else could. She had recurring dreams of the incident. She hallucinated, hearing voices that were highly critical of her. The disorder left her hyperalert to her environment. She would likely suffer some effect of this disorder for many years. As most of A.M.'s emotional problems arose after the February 2005 incident, the expert opined that her current emotional distress was the result of that incident.

At the close of A.M.'s case-in-chief, Albertsons moved for nonsuit, arguing that a single incident could not constitute a failure to accommodate. The trial court denied the motion.

During the defense part of the case, two psychiatric experts testified on Albertsons's behalf about many factors that would tend to support a finding that A.M. was unusually susceptible. The first did not diagnose A.M. with posttraumatic stress disorder and concluded that the depression that he observed in April 2005 resulted from events that predated the February 2005 incident. On cross-examination, the defense expert admitted that he had no evidence that A.M. suffered any psychotic symptoms—smelling urine and hearing accusatory voices—before the February 2005 incident and opined that that incident "opened the floodgates" for her prior symptoms to be fully displayed.

The second defense expert also offered evidence of A.M.'s fragility. He concluded that she had been depressed and anxious most of her adult life, even before the February 2005 incident. He concluded that the totality of her life experience made her more vulnerable to experience the February 2005 incident than she would have been otherwise. He opined that this incident triggered a shift in A.M. from a general anxiety disorder to a more severe disorder with psychotic features.

In June 2008, the jury found for A.M. on the cause of action for failure to accommodate her in February 2005. In a special verdict, it found that Albertsons knew that A.M. had a physical condition that limited a major life activity; it failed to provide reasonable accommodation for that condition on February 11, 2005; and that failure was a substantial factor in causing harm to A.M.[5] The jury awarded A.M. $200,000 in damages—$12,000 for past lost wages, $40,000 in future medical expenses, and $148,000 for past emotional distress. Albertsons moved for a new trial, asserting instructional error. A.M. opposed the motion, which the trial court ultimately denied.

---

[5] It rejected A.M.'s second claim that Albertsons failed to engage in the interactive process with her to determine a reasonable accommodation when she tried to return to work in the summer of 2005.

## II. NONSUIT

First, Albertsons contends that because there was no actionable failure to accommodate A.M., the trial court improperly denied its motion for nonsuit. It asks us to reverse the jury's verdict against it, asserting that it was based on an improper legal standard. It asserts that the February 2005 incident must be viewed in the context of many months during which Albertsons did accommodate A.M.'s disability. At trial, Albertsons's primary theory of defense was that it had fulfilled its obligation to accommodate A.M. In its view, the February 2005 incident occurred because A.M. did not simply leave her checkstand to use the restroom or at least mention to Sampson that she had been granted an accommodation. Thus, Albertsons asserts that A.M. had a continuing duty to communicate and act reasonably with respect to her accommodation.

Albertsons contends that the trial court should have granted its motion for nonsuit. On appeal from the denial of a motion for nonsuit, we apply the same rules that the trial court applied. A defendant is entitled to a nonsuit if we find that the plaintiff's evidence is not sufficient as a matter of law to permit a jury to find in his or her favor. When making this determination, we do not weigh the evidence or determine the credibility of witnesses, but accept that view of the evidence most favorable to the plaintiff as true and disregard all contrary evidence. We indulge in every legitimate inference that may be drawn from the plaintiff's evidence. (*Nally v. Grace Community Church* (1988) 47 Cal.3d 278, 291 [253 Cal.Rptr. 97, 763 P.2d 948]; *Murray's Iron Works, Inc. v. Boyce* (2008) 158 Cal.App.4th 1279, 1285 [71 Cal.Rptr.3d 317]; *Saunders v. Taylor* (1996) 42 Cal.App.4th 1538, 1541 [50 Cal.Rptr.2d 395].) Thus, the standard for obtaining a nonsuit can be difficult to achieve. As a motion for nonsuit raises an issue of law, we review the trial court's ruling de novo on appeal. (*Saunders v. Taylor, supra,* at pp. 1541–1542.)

Under the FEHA,[6] an employer that fails to make reasonable accommodation for an employee's known physical disability engages in an unlawful employment practice. (§ 12940, subd. (m).) It is also an unlawful employment practice for an employer to fail to engage in a good faith interactive process with the employee to determine an effective reasonable accommodation if an employee with a known physical disability requests one. (§ 12940, subd. (n); see § 12926.1, subd. (e).) The failure to accommodate and the

---

[6] Albertsons would have us consider federal authorities relating to the Americans with Disabilities Act of 1990 (ADA; 42 U.S.C. § 12101 et seq.) when interpreting the state FEHA. While the two provisions have some parallels, cases have found the ADA provisions defining reasonable accommodation to be materially different from the comparable FEHA provision. In such circumstances, we believe it to be the wiser practice to interpret our state provision in accordance with state law, rather than federal cases, statutes and regulations. (See *Bagatti v. Department of Rehabilitation* (2002) 97 Cal.App.4th 344, 362 [118 Cal.Rptr.2d 443].)

failure to engage in the interactive process are separate, independent claims involving different proof of facts. (*Wysinger v. Automobile Club of Southern California* (2007) 157 Cal.App.4th 413, 424 [69 Cal.Rptr.3d 1].) The purpose of the interactive process is to determine what accommodation is required. (*Id.* at p. 425.) Once a reasonable accommodation has been granted, then the employer has a duty to provide that reasonable accommodation. (See § 12940, subd. (m).)

The meaning of the statutory language is an issue of law for us to determine anew on appeal. (*California Teachers Assn. v. San Diego Community College Dist.* (1981) 28 Cal.3d 692, 699 [170 Cal.Rptr. 817, 621 P.2d 856]; *McLaughlin v. State Bd. of Education* (1999) 75 Cal.App.4th 196, 210 [89 Cal.Rptr.2d 295].) Albertsons takes a broad view of the failure to accommodate, arguing that A.M. failed to continue the interactive process by notifying Sampson of her disability and of management's granting of the agreed-upon accommodation.[7] Acceptance of this argument would require us to blur the distinctions between these two different violations of the FEHA— the failure to engage in a good faith interactive process to determine a reasonable accommodation for an employee's disability and the failure to provide a reasonable, agreed-upon accommodation. (See § 12940, subds. (m), (n).)

None of the legal authorities that Albertsons cites persuades us that the Legislature intended that after a reasonable accommodation is granted, the interactive process continues to apply in a failure to accommodate context. All of the case authority that Albertsons cites in support of its novel claim relates to the determination of a reasonable accommodation or the reconsideration of that determination after a reasonable accommodation fails. None of them involves a FEHA cause of action for failure to provide an agreed-upon accommodation, but relates to the initial process by which a reasonable accommodation is granted. (See, e.g., *Humphrey v. Memorial Hospitals Ass'n.* (9th Cir. 2001) 239 F.3d 1128, 1137–1138 [continuing duty to engage in interactive process to respond to repeated requests for reasonable accommodation].) To graft an interactive process intended to apply to the determination of a reasonable accommodation onto a situation in which an employer failed to provide a reasonable, agreed-upon accommodation is contrary to the apparent intent of the FEHA and would not support the public policies behind that provision.

Albertsons also argues that its February 2005 failure to accommodate was trivial, because it constituted a single incident in the context of a much longer

---

[7] This argument is countered somewhat by evidence of Albertsons's own policy that it did not require an employee who needed an ongoing accommodation to ask to be granted that accommodation each time it needed to be provided.

period of successful accommodation beginning in January 2004 when A.M. returned to work after her cancer treatment. In essence, Albertsons reasons that the FEHA allows for at least one failure to accommodate, if a pattern of successful accommodation also is shown. In order to be entitled to a nonsuit, Albertsons must show as a matter of law that under no circumstances could a single failure to accommodate support a finding of a failure to accommodate. (See *Nally v. Grace Community Church, supra,* 47 Cal.3d at p. 291; *Murray's Iron Works, Inc. v. Boyce, supra,* 158 Cal.App.4th at p. 1285.)

In our view, to adopt this interpretation of a failure to accommodate would be inconsistent with the FEHA. The statute does not speak of a pattern of failure and Albertsons cites no case authority supporting its interpretation of the FEHA failure to accommodate statute requiring one. (See § 12940, subd. (m).)

■ The employer's interpretation also would be inconsistent with the statutory purpose to require employers to make reasonable accommodation for their employees' physical disabilities. (See § 12940, subd. (m).) As is demonstrated by A.M.'s case, a single failure to make reasonable accommodation can have tragic consequences for an employee who is not accommodated. When construing a statute, we seek to interpret it in a manner that promotes wise policy, not absurdity. (*Bonnell v. Medical Board* (2003) 31 Cal.4th 1255, 1260–1261 [8 Cal.Rptr.3d 532, 82 P.3d 740]; *McLaughlin v. State Bd. of Education, supra,* 75 Cal.App.4th at p. 211.) ■ To the extent that a single failure to accommodate could be trivial within the context of a larger pattern of accommodation, we note that Albertsons argued this possibility to the jury. By its award to A.M. of $200,000 in damages, we infer that it found the failure to accommodate to be substantial, not trivial. As Albertsons did not establish its right to a nonsuit as a matter of law, the trial court properly denied the motion. (See *Nally v. Grace Community Church, supra,* 47 Cal.3d at p. 291; *Murray's Iron Works, Inc. v. Boyce, supra,* 158 Cal.App.4th at p. 1285.)

## III.  JURY INSTRUCTIONS

### A.  *Refused*

Next, Albertsons contends that the trial court erred by refusing its proposed jury instruction on primary theories of defense. At trial, Albertsons proposed two special instructions be given to the jury. The instruction on the interactive process would have told the jury: "In determining whether an employee's disability can be reasonably accommodated, the law requires that the employer and the employee engage in an interactive process. This process embodies a shared responsibility between the employer and the employee.

There must be a mutual exchange of information and a good faith exploration of possible accommodations between the employer and the employee. It is the responsibility of both sides to keep communication open, and neither side has a right to obstruct the process. After putting his or her employer on notice that he or she has a disability, the employee retains a duty to cooperate with the employer's efforts to accommodate his or her special needs." The companion instruction on liability for failure to accommodate would have told the jury: "An employer has liability for failure to accommodate only where the employer, not the employee, bears responsibility for the breakdown in the interactive process."

A.M. opposed the giving of these instructions, arguing that the interactive process was the process by which a reasonable accommodation was fashioned, not about delivering the promised accommodation. The trial court refused both proposed jury instructions, finding that they misstated the law on failure to provide a reasonable accommodation.[8] Albertsons argued to the jury that the single incident that occurred on February 11, 2005, should be placed in the larger context of accommodation that had been provided to A.M. over more than a year's time. It argued that A.M. was responsible for the incident, because she did not simply walk away from her checkstand to go to the bathroom. The jury found for A.M. and against Albertsons. The trial court rejected Albertsons's motion for new trial based, in part, on the refused jury instructions.

On appeal, Albertsons asserts that, for the same reason that the trial court erred in its interpretation of the FEHA resulting in the denial of its motion for nonsuit, the trial court erroneously rejected its proposed jury instructions. Thus, it implicitly acknowledges that its claim of error on these instructions stands or falls with its underlying argument about the proper interpretation of the FEHA. As we have concluded that the trial court correctly interpreted the FEHA when it properly denied Albertsons's motion for nonsuit, we necessarily find that it properly refused to give proposed instructions that were consistent with the employer's flawed interpretation of the underlying law.

B. *Given*[*]

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

[8] On A.M.'s second cause of action for failure to engage in the interactive process in the summer of 2005, the jury was instructed that A.M. had to be willing to engage in that process in order to recover on that cause of action.

[*]See footnote *ante,* page 455.

## DISPOSITION

The judgment is affirmed.

Ruvolo, P. J., and Sepulveda, J., concurred.