Filed 2/18/21

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| LAURIE BROWN, | B294240 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. BC697060) |
| v. | |
| LOS ANGELES UNIFIED SCHOOL DISTRICT, | |
| Defendant and Respondent. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Richard E. Rico, Judge.  Reversed in part and affirmed in part.

JML Law, Joseph M. Lovretovich and Jennifer A. Lipski for Plaintiff and Appellant.

Anthony J. Bejarano and David V. Greco for Defendant and Respondent.

———————————

# INTRODUCTION

Appellant Laurie Brown (Brown) has been a teacher employed by the Los Angeles Unified School District (LAUSD) since 1989.  In 2015, LAUSD installed an updated Wi-Fi system at the school where Brown taught.  She soon began to experience headaches and nausea, and believed the electromagnetic frequency of the new wireless system was the cause.  She requested various accommodations from LAUSD, but ultimately sued, alleging LAUSD discriminated against her based on her "electromagnetic hypersensitivity," failed to accommodate her condition, and retaliated against her—in violation of the California Fair Employment and Housing Act (FEHA) (Gov. Code,[1] § 12900 et seq.).

Brown appeals from a judgment of dismissal entered after the trial court sustained LAUSD's demurrer to her first amended complaint (FAC) without leave to amend.  She contends the trial court erred in sustaining the demurrer because she pled sufficient facts in support of each of her claims.  She further contends the trial court abused its discretion by not granting her leave to amend the FAC.

We conclude Brown adequately pled her cause of action for failure to provide reasonable accommodation for her disability.  We reverse on this cause of action only.  Otherwise, the judgment is affirmed.

---

[1]     All further statutory references are to the Government Code unless otherwise designated.

2

# FACTUAL AND PROCEDURAL BACKGROUND

A.  *Relevant Factual Background*

In 2012, LAUSD commissioned URS Corporation (URS) to consult with LAUSD about replacing the existing Wi-Fi system at Millikan Middle School (Millikan) with one that would accommodate iPads, Chromebooks, and tablets LAUSD intended to provide its students.

LAUSD requested public comment on the proposed new Wi-Fi system.  Cindy Sage, an environmental scientist and expert on electromagnetic frequency (EMF), stated she could not support URS's conclusions about the safety of the new Wi-Fi system.

During a May 28, 2014, school board hearing, LAUSD's "medical personnel" presented a power point presentation indicating they were uncertain about any long-term effects the Wi-Fi system may have on students and staff.  LAUSD promised to continue actively monitoring any developments.

In 2015, Brown began teaching at Millikan.  Later that year, in April 2015, LAUSD installed and began operating the upgraded Wi-Fi system at Millikan.  Brown thereafter experienced chronic pain, which she alleged was caused by the new Wi-Fi.

B.  *Brown's First Amended Complaint*

On March 7, 2018, Brown filed a civil complaint against LAUSD.  On June 6, 2018, the trial court sustained a demurrer to the complaint with leave to amend.

On June 26, 2018, Brown filed the FAC which alleged five causes of action pursuant to FEHA:

1) Discrimination based on physical disability;
2) Failure to accommodate;
3) Failure to engage in the interactive process;
4) Retaliation; and
5) Failure to prevent discrimination and retaliation.

The FAC alleged:

Following activation of the new Wi-Fi system on April 23, 2015, Brown began to experience chronic pain, headaches, nausea, itching, burning sensations on her skin, ear issues, shortness of breath, inflammation, heart palpitations, respiratory complications, foggy headedness, and fatigue. She reported the symptoms to her superiors at Millikan and was granted leave from work "due to these symptoms, on an intermittent basis, for several days thereafter."

She returned to campus the following week and fell ill again "[w]ithin 2 to 3 hours." Her "medical provider subsequently diagnosed her" with electromagnetic hypersensitivity (EHS), also referred to as "microwave sickness."

On May 22, 2015, Brown filed her first formal request for accommodation with LAUSD.

On July 15, 2015, LAUSD held its first interactive process meeting with Brown. Following the meeting, LAUSD agreed to disconnect the Wi-Fi access points in Brown's assigned classroom and in an adjacent classroom. LAUSD also agreed to use "a hardwired computer lab with Wi-Fi turned off while testing for Common Core."

On August 4, 2015, "Dr. Huy Hoang, internist, wrote that emerging EMF sensitivity was disabling" Brown.

Brown returned to work in August 2015. She was assigned to Room 22 at the Millikan campus. Brown alleged LAUSD's

4

accommodations were "not reasonable" and "did not work." While LAUSD disconnected the routers in Brown's classroom and one adjoining classroom, "multiple other classrooms in front and to the side of [Brown]'s classroom continued to have their routers active."

On September 3, 2015, Brown's physician, Dr. Jody Levy, placed her on a medical leave of absence through November 16, 2015, due to her "migraines, headaches, and nausea. Restrictions upon returning to work were for [Brown] to work with minimal Wi-Fi exposure."

On September 8, 2015, Brown filed a second request for accommodation "on the grounds her symptoms persisted due to Wi-Fi and radio frequencies to which she was continuously exposed." She requested LAUSD reduce her exposure and consider "using paints and other forms of shielding materials to block Wi-Fi and radio frequencies in her classroom."

On October 22, 2015, LAUSD held its second interactive process meeting with Brown. Brown requested LAUSD authorize "further studies to evaluate and determine the best location on the Millikan campus where [Brown] would encounter minimal exposure to Wi-Fi and radio frequencies, along with consideration of using paints and other shielding materials."

On November 13, 2015, LAUSD denied Brown's second request for accommodation, relying on testing performed by URS that indicated the Wi-Fi system was "safe." Brown appealed LAUSD's denial.

Meanwhile, Brown's medical leave was extended from November 2015 through June 14, 2016 by Dr. Michael Hirt, "citing migraines and nausea. Restrictions include minimal EMF

5

exposure and writes patient could return to work if EMF exposure [or] measurement were reduced."

The appeal hearing took place in February 2016.  LAUSD "reversed course" and agreed to provide a "neutral expert EMF inspection for further microwave measurements."  Brown was notified that LAUSD will provide Brown "with the test results, but is not required to provide [her] advance information regarding the logistics of the testing."

On April 18, 2016, LAUSD provided Brown with three options for neutral EMF testing:  1) allow LAUSD's retained consultant URS to conduct the requested testing; 2) choose another consultant "which might delay the process"; or 3) advise LAUSD she no longer desired additional EMF testing.

On April 26, 2016, Brown indicated she wanted a different consultant—not URS—to conduct the additional EMF testing/inspection.  She alleged "a new analysis by URS, LAUSD's own consultant, would be inherently biased due to URS' relationship with LAUSD."  Brown alleged, however, that LAUSD failed to inform her that "selecting another consultant would require the consultant to submit to LAUSD's bidding process for a contract to do the inspection."[2]

On June 19, 2016, LAUSD notified Brown it did not agree with her selected consultant and that URS's "prior evaluation of Wi-Fi and radio frequencies at Millikan evidenced a safe and non-hazardous working environment."

---

[2]    We gather from LAUSD's demurrer that Brown was unaware of LAUSD's "statutory obligation to undergo competitive bidding for any contracts until January 2017."

6

In November 2016, Brown followed up with LAUSD about what "reasonable accommodation" LAUSD would provide.  In January 2017, Brown sent LAUSD another follow-up email and expressed "frustration and concerns about LAUSD appearing to retract the accommodation it had promised . . . a year earlier."

Brown alleged she could not return to work "without being overcome with crippling pain."  She was "forced to go out on a disability leave from her job, which exhausted her approximately 800 hours of accrued paid time off and sick leave."  As a result, she experienced "an economic loss of earnings due to not receiving her full income."

Based on the foregoing, Brown argued LAUSD "engaged in a course or pattern of conduct that, taken as a whole, materially and adversely affected the terms, conditions, or privileges" of Brown's employment.  She believed she "could have continued performing all essential duties and functions of her job" had she been provided reasonable accommodations from LAUSD.  She argued LAUSD failed to "engage in an interactive process" with Brown and "explore all reasonable accommodation for her physical disability."  Brown also characterized the foregoing as "adverse employment action" and "discriminatory and retaliatory conduct."

She requested general damages, special damages, loss of earnings and benefits, attorney fees and costs, injunctive relief, equitable relief, and any other relief the trial court deemed just and proper.

## C.    *LAUSD's Demurrer and Brown's Opposition*

On July 31, 2018, LAUSD filed a demurrer to the FAC pursuant to Code of Civil Procedure section 430.10, subdivision (e).  LAUSD argued Brown failed to allege with particularity sufficient facts in support of her causes of action.  Brown's FAC did not include any facts that demonstrated LAUSD's decision not to provide additional testing created adverse work conditions such that a reasonable person would have felt compelled to resign.  LAUSD next pointed out that Brown had not pled facts that would establish the original testing by URS was "unreliable or faulty" and instead merely concluded "URS is biased."

LAUSD argued Brown did not suffer any adverse employment action, "much less an adverse action *because* of her alleged medical condition."  Per LAUSD, Brown "voluntarily chose" to go on leave; she was never dismissed.  LAUSD argued it "went above and beyond to accommodate" Brown's alleged disability and provided examples of accommodations it had granted.  LAUSD noted Brown's symptoms mysteriously persisted "despite being away from Millikan's campus and being on a lengthy approved leave of absence."

LAUSD requested the court sustain the demurrer without leave to amend, as Brown could not identify any adverse employment action taken by LAUSD *because* of her disability.

On August 14, 2018, Brown filed her opposition to LAUSD's demurrer.  She argued the FAC alleged sufficient facts to establish all five causes of action.  She further argued that while LAUSD "*proposed* multiple efforts, [it] *never implemented* any of them fully."  (Boldface omitted.)

8

D.    *Hearing and Ruling*

On August 27, 2018, the trial court entertained brief oral argument and took the matter under submission.

The next day, on August 28, 2018, the court sustained the demurrer without leave to amend as to all five causes of action.

On September 20, 2018, the court signed the judgment of dismissal.

Brown timely appealed from the judgment.

## DISCUSSION

As a preliminary matter, we disagree with LAUSD that Brown failed to include a complete record. The record does not include a copy of the original complaint, first demurrer, and the court's June 6, 2018 ruling. However, the absence of these pleadings does not foreclose our review of Brown's contentions on appeal. Where, as here, Brown amended the original complaint, the FAC supersedes the original complaint. (See *Alfaro v. Community Housing Improvement System & Planning Assn., Inc.* (2009) 171 Cal.App.4th 1356, 1372.) The record on appeal contains the operative FAC and LAUSD's demurrer; these are the pleadings necessary for our review.

A.    *Standard of Review*

A demurrer tests the legal sufficiency of the challenged pleading. (*Milligan v. Golden Gate Bridge Highway & Transportation Dist.* (2004) 120 Cal.App.4th 1, 5.) We review de novo a trial court's ruling on a demurrer. (*Dudek v. Dudek* (2019) 34 Cal.App.5th 154, 163 (*Dudek*).) We accept as true all material facts properly pleaded in the complaint, but do not assume the truth of contentions, deductions, or conclusions of fact and law.

9

(*Ibid.*; *Estate of Holdaway* (2019) 40 Cal.App.5th 1049, 1052.) The question of a plaintiff's ability to prove the allegations, or the possible difficulty in making such proof, does not concern the reviewing court and plaintiffs need only plead facts showing that they may be entitled to some relief. (*Alcorn v. Anbro Engineering, Inc.* (1970) 2 Cal.3d 493, 496.)

In addition, " '[w]hen a demurrer is sustained without leave to amend, "we decide whether there is a reasonable possibility that the defect can be cured by amendment: if it can be, the trial court has abused its discretion and we reverse; if not, there has been no abuse of discretion and we affirm." ' " (*Dudek*, *supra*, 34 Cal.App.5th at p. 163.) Brown shoulders the burden to show a reasonable possibility the FAC can be amended to state a cause of action. (*Id*. at pp. 163–164.)

B.    *Brown Adequately Pled a Physical Disability.*

In an argument it makes as to all five causes of action, LAUSD contends Brown's alleged disability, electromagnetic sensitivity, is not a "recognized" disability. In support of this contention, LAUSD relies on a federal case from the Seventh Circuit and a federal district court case from the District of Massachusetts, both interpreting the Americans with Disabilities Act of 1990 (ADA): *Hirmiz v. New Harrison Hotel Corp.* (7th Cir. 2017) 865 F.3d 475 and *G v. Fay Sch., Inc.* (D. Mass. 2017) 282 F.Supp.3d 381.

LAUSD's reliance on ADA cases is misplaced. The FEHA protections against torts based on disability are independent of those under the ADA. "The law of this state in the area of disabilities provides protections independent from those in the federal Americans with Disabilities Act of 1990 . . . . Although the federal act provides a floor of protection, this state's law has

10

always, even prior to passage of the federal act, afforded additional protections." (§ 12926.1, subd. (a); Cal. Code Regs., tit. 2, § 11065, subd. (d)(8).)  The Legislature has stated its intent that "physical disability" be construed so that employees are protected from discrimination due to actual or perceived physical impairment that is disabling, potentially disabling, or perceived as disabling or potentially disabling.  (§ 12926.1, subd. (b); Cal. Code Regs., tit. 2, § 11065, subds. (d)(4)–(6).)  And the Legislature has specifically stated its intent that the FEHA provide broader protection than under the ADA.  (§ 12926.1, subd. (c); Cal. Code Regs., tit. 2, § 11065, subd. (d)(8).)

FEHA states a "physical disability" includes, but is not limited to, "any physiological disease, disorder, condition, cosmetic disfigurement, or anatomical loss that does both of the following:  [¶]  (A) Affects one or more of the following body systems: neurological, immunological, musculoskeletal, special sense organs, respiratory, including speech organs, cardiovascular, reproductive, digestive, genitourinary, hemic and lymphatic, skin and endocrine.  [¶]  (B) Limits a major life activity.  For purposes of this action:  [¶] . . . [¶]  (ii) A . . . condition . . . limits a major life activity if it makes the achievement of the major life activity difficult.  [¶]  (iii) 'Major life activities' shall be broadly construed and includes physical, mental, and social activities and working." (§ 12926, subd. (m)(1); see also Cal. Code Regs., tit. 2, § 11065, subd. (d)(2)(A), (B).)

The FAC alleges that Brown could not work because she experienced "the various symptoms of which LAUSD had been warned could occur, namely, chronic pain, headaches, nausea, itching, burning sensations on her skin, ear issues, shortness of

11

breath, inflammation, heart palpitations, respiratory complications, foggy headedness, and fatigue, all symptoms of Microwave Sickness or EHS." These described symptoms affect one or more of the body systems listed in the statute and limited Brown's major life activity of working as a teacher at Millikan. That the ADA may not "recognize" EHS is immaterial to our interpretation of FEHA. Brown adequately pled physical disability within the four corners of the statute.

C.   *Brown Failed to Allege Adverse Employment Action Taken Against Her with Discriminatory or Retaliatory Motive*

LAUSD next argues that the first cause of action for discrimination based on physical disability and the fourth cause of action for retaliation fail for lack of specificity and are insufficient to withstand the demurrer. We agree.

1.   Retaliation

The elements of a cause of action for retaliation in violation of section 12940, subdivision (h) are: "1) the employee's engagement in a protected activity . . . ; (2) retaliatory animus on the part of the employer; (3) an adverse action by the employer; (4) a causal link between the retaliatory animus and the adverse action; (5) damages; and (6) causation." (*Mamou v. Trendwest Resorts, Inc.* (2008) 165 Cal.App.4th 686, 713; *Le Mere v. Los Angeles Unified School Dist.* (2019) 35 Cal.App.5th 237, 243.)

Here, the FAC alleges no facts coming close to retaliatory actions or motive. According to the FAC, Brown made her complaints that the Wi-Fi system was adversely affecting her health; the parties engaged in the interactive process to arrive at a reasonable accommodation; LAUSD made promises to take certain actions to reasonably accommodate her complaints;

12

LAUSD later reneged on its promises because it decided to rely on the findings of its consultant URS that the campus was "safe." She alleges no retaliatory actions taken against her precisely because she engaged in protected activity, that is, because she made her initial complaint. Brown conflates actions taken by LAUSD in response to the complaint with actions taken by LAUSD to harm her because of her complaint. None of the alleged facts implicate retaliation.

### 2. Discrimination

Under section 12940, it is unlawful for an employer, because of physical disability, to "refuse to hire or employ the person or to refuse to select the person for a training program leading to employment, or to bar or to discharge the person from employment or from a training program leading to employment, or to discriminate against the person in compensation or in terms, conditions, or privileges of employment." (§ 12940, subd. (a).) The elements of a prima facie case of discrimination vary depending on the particular facts. Generally, the plaintiff must provide evidence that he or she (1) was a member of a protected class; (2) was qualified for the position sought or was performing competently in the position already held; (3) suffered an adverse employment action, such as termination, demotion, or denial of an available job; and (4) some other circumstance suggests discriminatory motive. (*Guz v. Bechtel National, Inc.* (2000) 24 Cal.4th 317, 355.) Evidence of discriminatory motive must be examined carefully in disability discrimination cases to determine "whether there is direct evidence that the motive for the employer's conduct was related to the employee's physical or mental condition." (*Wallace v. County of Stanislaus* (2016) 245 Cal.App.4th 109, 123.)

13

FEHA proscribes two types of disability discrimination: (1) discrimination arising from an employer's intentionally discriminatory act against an employee because of his or her disability (referred to as disparate treatment discrimination) and discrimination resulting from an employer's facially neutral practice or policy that has a disproportionate effect on employees suffering from a disability (referred to as disparate impact discrimination). (*Knight v. Hayward Unified School Dist.* (2005) 132 Cal.App.4th 121, 128–129, disapproved on other grounds in *Williams v. Chino Valley Independent Fire Dist.* (2015) 61 Cal.4th 97, 115.)

Here, just as with the retaliation cause of action, there are two issues as to the discrimination cause of action: whether Brown sufficiently alleged that LAUSD took any adverse employment actions and whether Brown sufficiently alleged facts to support the allegation of discriminatory motive. Brown contends LAUSD refused to participate in the interactive process in good faith and refused to put in place reasonable accommodations to which it has previously agreed. While these allegations against LAUSD support other causes of action as discussed below, we conclude they do not constitute "adverse employment actions" in the context of a claim of discrimination.

Our Supreme Court has recognized that what constitutes an adverse employment action "is not, by its nature, susceptible to a mathematically precise test," and, as a result, "the significance of particular types of adverse actions must be evaluated by taking into account the legitimate interests of both the employer and the employee." (*Yanowitz v. L'Oreal USA, Inc.* (2005) 36 Cal.4th 1028, 1054.) *Yanowitz* defined an adverse employment action generally as one that materially affects the

14

terms and conditions of employment. (*Id*. at p. 1051, fn. 10.) The phrase "terms, conditions or privileges" of employment must be interpreted liberally and with a reasonable appreciation of the realities of the workplace in order to afford employees the appropriate and generous protection against employment discrimination that the FEHA was intended to provide." (*Id*. at p. 1054.) It is appropriate to consider plaintiff's allegations collectively under a totality-of-the-circumstances approach. (*Id*. at p. 1052, fn. 11 & pp. 1055–1058.)

However, we note the FEHA scheme prohibits specific unlawful employment practices by covered employers, e.g., discrimination, retaliation, failure to make reasonable accommodation, failure to engage in the interactive process with the employee. We conclude that the commission of one specific prohibited employment practice does not, in and of itself, constitute commission of all other prohibited employment practices under the broad rubric of policies or practices affecting the "terms, conditions or privileges of employment." Such an interpretation would be contrary to the whole point of specifically separating conduct into individual unlawful employment practices. Brown has not alleged she was the target of disparate treatment. Nor has she alleged a policy or practice that had a disproportionate effect on employees suffering from a disability. She simply alleged that LAUSD failed to engage meaningfully with her in the interactive process and would not reasonably accommodate her disability. Those allegations pertain to her remaining causes of action, but we decline to construe them, without more, as adverse employment actions sufficient to support a claim of discrimination in the terms and conditions of employment. We agree with the trial court that Brown has

15

conflated " 'adverse employment action' with the failure to accommodate and failure to engage claims."

Moreover, even if the allegations are deemed sufficient to constitute adverse employment actions, Brown has alleged no facts from which discriminatory intent be inferred. In other words, she has alleged no facts from which we can infer LAUSD clung to its belief that the campus was safe and refused to accommodate her because it was biased against her as a person with a disability. At most, the FAC alleged facts showing a disagreement between the parties as to whether the Wi-Fi was causing her disability. We conclude she has failed to allege discrimination in employment.

Because we find Brown has failed to allege discrimination or retaliation in employment, we also conclude she has failed to sufficiently allege, in her fifth cause of action, failure to prevent discrimination and retaliation in employment, in violation of section 12940, subdivision (k).

D.    *Brown Adequately Pled a Cause of Action for Failure to Provide Reasonable Accommodation for a Physical Disability*

An employer must provide a reasonable accommodation for an applicant or employee with a known mental or physical disability unless the accommodation would cause undue hardship. Failure to do so is an unlawful employment practice. (§ 12940, subd. (m)(1); Cal. Code Regs., tit. 2, § 11068 subd. (a).) Failure to do so is an unlawful employment practice.

To establish a failure to accommodate claim, Brown must show (1) she has a disability covered by FEHA; 2) she can perform the essential functions of the position; and 3) LAUSD failed reasonably to accommodate her disability. (*Jensen v. Wells*

16

*Fargo Bank* (2000) 85 Cal.App.4th 245, 256–257.) A "reasonable accommodation" means a modification or adjustment to the workplace that enables the employee to perform the essential functions of the job held or desired. (*Scotch v. Art Institute of California* (2009) 173 Cal.App.4th 986, 1010.) Although an accommodation is not reasonable if it produces an undue hardship to the employer, a plaintiff need not initially plead or produce evidence showing that the accommodation would not impose such an undue hardship. (*Bagatti v. Department of Rehabilitation* (2002) 97 Cal.App.4th 344, 356.) Importantly, whether plaintiff's requested accommodation is reasonable cannot be determined on demurrer. (*Id.* at p. 368–369.)

Once notified of a disability, the employer's burden is to take positive steps to accommodate the employee's limitations. The employee also retains a duty to cooperate with the employer's effort by explaining his or her disability and qualifications. Reasonable accommodation thus envisions an exchange between employer and employee where each seeks and shares information to achieve the best match between the employee's capabilities and available positions. (*Spitzer v. Good Guys, Inc.* (2000) 80 Cal.App.4th 1376, 1385 (*Spitzer*).) If a reasonable accommodation does not work, the employee must notify the employer, who has a duty to provide further accommodation. (See *id.* at p. 1384 [if employer did not know a reasonable accommodation was not working, a duty to provide further accommodation never arose].)

Brown has adequately pled failure to accommodate. The FAC alleges that she suffers from a physical disability, but can perform the essential functions of the position with the accommodation "to which LAUSD initially agreed to but

17

subsequently refused to honor and/or other reasonable accommodations, such as use of paints, fabrics and/or other shielding materials to block or minimize exposure to electromagnetic frequencies." Further, although LAUSD provided Brown with three options to choose from for neutral EMF testing, including the option to choose a consultant other than URS to conduct the testing (which Brown opted for), LAUSD reneged on its agreement, concluded that URS's prior evaluation evidenced a safe, non-hazardous working environment, and took no further action. As mentioned above, "reasonable accommodation" envisions an exchange between employer and employee in good faith; based on our reading of Brown's FAC, LAUSD's actions here do not align with those of an employer taking positive steps to accommodate the employee's limitations (*Spitzer*, *supra*, 80 Cal.App.4th at p. 1385).

On appeal LAUSD argues that it attempted to accommodate her multiple times to no avail. It also argues that because Brown alleged that she suffered symptoms at her home, there was nothing LAUSD could do to ameliorate her disability. These are questions for the ultimate finder of fact and not questions properly resolved by demurrer. Brown's allegations were sufficient.

E.     *Brown Failed to Allege Failure to Engage in the Interactive Process.*

Under FEHA, it is an unlawful practice for an employer to fail to engage in a good faith interactive process with the employee to determine an effective reasonable accommodation if an employee with a known physical disability requests one. (§ 12940, subd. (n); see § 12926.1, subd. (e); *A.M. v. Albertsons, LLC* (2009) 178 Cal.App.4th 455, 463 (*Albertsons*).) Failure to

18

accommodate and failure to engage in the interactive process are separate, independent claims involving different proof of facts. The purpose of the interactive process is to determine what accommodations is required.  Once a reasonable accommodation has been granted, then the employer has a duty to provide that reasonable accommodation.  (*Albertsons,* at pp. 463–464.)

Here, Brown's FAC alleges LAUSD did agree on a reasonable accommodation (to hire an independent consultant to determine where on campus exposure to the electromagnetic frequencies was most minimal) and then changed its mind, deciding that the campus was "safe."  This is not a failure to engage in the interactive process; it is a failure to follow up with an accommodation to which it had agreed.  (*Albertsons*, *supra*, 178 Cal.App.4th at pp. 463–464.)

*Albertsons* is instructive in this regard.  In that case, employer Albertsons agreed to reasonable accommodations and then failed to advise plaintiff's supervisors about the agreement. As a result, when plaintiff sought to take advantage of the accommodations, her supervisors did not allow her to do so. Plaintiff employee sued for failure to accommodate.  Albertsons argued the plaintiff employee had a personal responsibility to advise her supervisors of her disability and of the agreed-upon accommodations.  Albertsons argued plaintiff's failure to so advise her supervisors constituted a failure by the employee to continue the interactive process and vitiated her cause of action for failure to accommodate.  (*Albertsons*, *supra*, 178 Cal.App.4th at p. 464.)

The Court of Appeal disagreed. It held that the Legislature did not intend that "after a reasonable accommodation is granted, the interactive process continues to apply in a failure to accommodate context." (*Albertsons*, *supra*, 178 Cal.App.4th at p. 464.) The court held that to "graft an interactive process intended to apply to the determination of a reasonable accommodation onto a situation in which an employer failed to provide a reasonable, agreed-upon accommodation is contrary to the apparent intent of the FEHA and would not support the public policies behind that provision." (*Ibid*.) Thus, a failure to engage in the interactive process cannot be used to support a failure to accommodate cause of action.

Here we have the inverse of *Albertsons*: the employee using a failure to accommodate in support of a claim of failure to engage in the interactive process. Brown alleged LAUSD agreed upon a reasonable accommodation (to hire a neutral expert to determine locations of minimal exposure) and then failed to follow through. We conclude Brown's allegations fit the logic of *Albertsons* holding. Without more, the allegations are insufficient under *Albertsons* to constitute a failure to engage in the interactive process.

F.     *The Trial Court Did Not Err in Sustaining the Demurrer Without Leave to Amend*

The trial court sustained the demurrer without granting Brown leave to amend the FAC. Generally, leave to amend is warranted when the complaint is in some way defective, but plaintiff has shown in what manner the complaint can be amended and " 'how that amendment will change the legal effect of [the] pleading.' " (*Goodman v. Kennedy* (1976) 18 Cal.3d 335, 349.) In her reply brief, Brown announced that she "need

20

not specify additional details for an amended complaint because she already alleged more than sufficient ultimate facts to support her claims and any additional allegations would be superfluous evidentiary facts." In the absence of proposed new facts, we find no error in the trial court's decision not to grant leave to amend.

## DISPOSITION

We reverse as to the cause of action for failure to accommodate. The judgment is affirmed in all other respects. Parties are to bear their own costs on appeal.

## CERTIFIED FOR PUBLICATION


STRATTON, J.

I concur:


GRIMES, Acting P. J.

21

**WILEY, J.**, Concurring.

I join the court's decision, which rejects a pleading challenge.  For good reason, California state civil procedure makes complaints easy to write and hard to attack:  experience shows litigation effort devoted solely to attacking pleadings is costly and time consuming and rarely yields much helpful information for litigants about the true value of their case. (Cf. Clermont & Yeazell, *Inventing Tests, Destabilizing Systems* (2010) 95 Iowa L.Rev. 821, 829–859 [critique of contrary federal practice that devotes much effort to testing litigation at the complaint stage].)

The consequence of this relatively lax state attitude is relatively easier access to discovery.  But California trial judges have the tools and training to curb weaponized discovery.

Instead of encouraging attacks at the pleading stage, ordinarily it is wiser for a procedural system to save the big litigation investments for stages where judicial rulings can provide the parties with information that helps them agree on the case's settlement value.

Yet even with our state's healthy attitudes about easy pleading, I worry about giving any sort of green light to this unprecedented and unorthodox disability claim.  Plaintiff's counsel was most reluctant at oral argument to admit it, but it seems clear we are the first court in the United States of America—a nation of over 300 million people—to allow a claim that "Wi-Fi can make you sick."  Up till now, the main published appellate opinion seems to have been the one where Judge Posner wrote that a "great deal of psychological distress is trivial—fear of black cats, for example."  (*Hirmiz v. New Harrison Hotel Corp.* (7th Cir. 2017) 865 F.3d 475, 476.)

1

Millions use Wi-Fi. Merchants, employers, cafes, hotels—indeed, commercial concerns of every kind throughout the land have been installing Wi-Fi at an impressive pace. Nearly everyone wants the phenomenal convenience of the virtual world in your hand, everywhere you go, and the faster the better. All the potential defendants responding to this popular demand may take solemn note of news that, as of today, their Wi-Fi systems now may possibly invite costly litigation from members of the public who say that Wi-Fi made them sick. And potential plaintiffs and their counsel will have an interest too.

The law worries about junk science in the courtroom. One concern is that a partisan expert witness can bamboozle a jury with a commanding bearing, an engaging manner, and a theory that lacks respectable scientific support. (E.g., *Daubert v. Merrell Dow Pharmaceuticals, Inc.* (1993) 509 U.S. 579, 595 (*Daubert*) [" 'Expert evidence can be both powerful and quite misleading because of the difficulty in evaluating it.' "].)

This concern is nothing new. The old fear is that "[e]xperience has shown that opposite opinions of persons professing to be experts may be obtained to any amount . . . ." (*Winans v. New York & Erie Railroad Co.* (1859) 62 U.S. (21 How.) 88, 101.)

" 'It is often surprising to see with what facility and to what an extent [experts'] views can be made to correspond with the wishes or interests of the parties who call them . . . . [T]heir judgment becomes so warped by regarding the subject in one point of view that even when conscientiously disposed, they are incapable of expressing a candid opinion. . . . They are selected on account of their ability to express a favorable opinion, which, there is great reason to believe, is in many instances the result

2

alone of employment and the bias growing out of it.' " (Foster, *Expert Testimony,—Prevalent Complaints and Proposed Remedies* (1897) 11 Harv. L.Rev. 169, 170–171; see Learned Hand, *Historical and Practical Considerations Regarding Expert Testimony* (1901) 15 Harv. L.Rev. 40, 53 (Learned Hand) ["the expert becomes a hired champion of one side"]; *id.* at pp. 54–55 [describing the "absurdity" and "evil" of the "present system"]; *id.* at p. 46 [recounting 1665 case where "Dr. Brown, of Norwich, was desired to state his opinion of the accused persons, and he was clearly of opinion that they were witches"].)

It does not take much experience as a trial judge in Los Angeles to realize the use of expert witnesses has run riot. To get a feel for the situation, try an internet search on "expert witness los angeles." If your client has the budget, the available inventory is remarkable. Surprising numbers of these experts also happen to be lawyers—or perhaps, after reflection, this is not so surprising.

The partisan expert witness has enormous potential as a weapon of pure advocacy. Excellent trial lawyers know this potential. They risk disadvantage and even defeat if they do not wring every drop of advocacy power from their retained experts. In this process, the search for truth can suffer. (E.g., Rubinfeld & Cecil, *Scientists as Experts Serving the Court* (Fall 2018) 147 Daedalus 152, 153 (Rubinfeld & Cecil).)

An expert witness can be the advocate's strongest ally. Mid-trial, after the opening statement and before the closing argument, the expert can argue the client's position in the most forceful terms, speaking directly to the judge and jury with a demeanor chosen for its fluent and compelling sincerity.

The expert's motivation can be prompted by ample compensation and guaranteed through careful selection. For the advocate, finding and selecting experts can be a momentous event in the litigation process. Resume horsepower is useful, but better yet is a captivating communication style married to the proper attitude.

What is the proper attitude? It can be a subtle thing, perhaps detected through give-and-take on casual and seemingly irrelevant issues during a private telephone call or a relaxed interview in a comfortable office. For the trial lawyer puzzling over whether to retain this expert, a core question is whether the expert will become a team player. At some deep level, will the expert come to embrace the cause of the client?

Experts with the proper attitude willingly deploy their potentially awesome experience and intelligence in the advocate's service. The result is unlikely to involve lying or deception, if for no other reason than such conduct rarely survives cross-examination. The result is, however, likely to be highly partisan. And the highly partisan character of expert testimony can imperil the search for truth.

When one trial lawyer tells a colleague in an unguarded moment that the lawyer is "shopping for an expert," we should reflect on how accurate this phrase truly is.

Our highest courts responded to these concerns by empowering trial judges to be gatekeepers and to sort the reliable from the speculative. (*Daubert, supra*, 509 U.S. at pp. 589–597; *Sargon Enterprises, Inc. v. University of Southern California* (2012) 55 Cal.4th 747, 753.) Gatekeeping may be vital to the integrity of this particular case. And rulings on *Sargon* motions

can give the parties information that is highly pertinent to the settlement value of a case.

Trial judges also have another tool in their kit: court-appointed experts. (See Evid. Code, §§ 730–732.) Preferably in consultation with counsel and avoiding ex parte contacts, the trial court can select and appoint an independent expert of unquestioned stature. The parties foot the bill. The expert can write a report, be deposed, testify, and be cross-examined, like any other expert. Crucially, the jury can learn this expert has been appointed by the court rather than hired by the parties.

The option of a court-appointed expert has been available in California for generations. Few judges have tried this option, though, because the parties *never* suggest it. The last thing trial lawyers want is another source of uncertainty in the case: something powerful and beyond their control. But the hard-working judges with experience "reported a high degree of satisfaction with the services provided by the expert . . . ." (Cecil & Willging, *The Use of Court-Appointed Experts in Federal Court* (1994) 78 Judicature 41, 42; cf. Learned Hand, *supra,* 15 Harv. L.Rev. at p. 56 [advocating "a board of experts or a single expert, not called by either side, who shall advise the jury of the general propositions applicable to the case . . . . "].)

The trial court may want to consider this option in this case. It is more effort to go off the beaten path, but scholarly literature can help by surveying some practical aspects. (See generally, Rubinfeld & Cecil, *supra* [citing and discussing sources].)

This nation has a vast wealth of genuine scientific expertise, and the pandemic has been forcing our scientists to become familiar with video communication. The internet has reduced the significance of geographic distance.

You don't need a Nobel prize winner: excellent junior faculty and even graduate students can be vastly knowledgeable, motivated, and hungry to boot. After all, few scholars are accustomed to the rates at which California lawyers bill. Authentic and objective experts thus may be surprisingly affordable, given the scholarly world's commitment to public service and the prestige and satisfaction that can flow from a judicial appointment like this. And once you appoint that expert, it can be startling how fast the case settles.

With concern and hope, I join the majority opinion.


WILEY, J.