Filed 4/15/21  Mann v. Spark Public Relations, LLC CA1/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIRST APPELLATE DISTRICT

## DIVISION ONE

| | |
|---|---|
| AARON MANN,<br><br>     Plaintiff, Cross-defendant and Appellant,<br><br>v.<br><br>SPARK PUBLIC RELATIONS, LLC et al.,<br><br>     Defendants, Cross-complainants and Respondents. | A155257<br><br>(San Francisco City & County Super. Ct. No. CGC-16-552836) |

Defendant Spark Public Relations, LLC (Spark) acquired plaintiff Aaron Mann's company, SocialArc, Inc. (SocialArc) and entered into an employment agreement with Mann.  During the acquisition process, SocialArc executed a loan agreement with Spark, for which Mann signed a personal guaranty.  Spark subsequently concluded Mann failed to meet certain performance metrics and terminated his employment.  In response, Mann sued Spark and its chief executive officer, defendant Alan Soucy, alleging various claims related to his employment agreement.  Spark and Soucy filed a cross-complaint against Mann, alleging breach of the personal guaranty and fraud.

Following trial, the jury returned a verdict in Spark's and Soucy's favor on all of Mann's claims apart from nonpayment of wages.  As to the cross-

complaint, the jury found in Spark's favor for the breach of personal guaranty.

On appeal, Mann contends insufficient evidence supports the jury verdict as to his claims for breach of contract and breach of the covenant of good faith and fair dealing. He further contends the trial court erred in denying his motion for nonsuit as to Spark and Soucy's cross-claim for breach of personal guaranty. We disagree and affirm the judgment.

## I. BACKGROUND

Mann operated a social media company called SocialArc, which provided brand strategy and certain analytics software it had developed. Soucy is the chief executive officer of Spark, a public relations firm.

Soucy and Mann agreed Spark would acquire certain assets of SocialArc. To that end, they signed a letter of intent contemplating Spark would purchase SocialArc's assets, "including intellectual property related to its services, databases, customer relationships, and equipment." The letter of intent also anticipated an employment agreement with Mann. He would operate a new "Digital Services Operating division" at Spark and receive a bonus tied to the specific financial performance of the division. The letter did not state a target acquisition date, and noted, "Each party shall be responsible for its own legal, accounting and other fees and expenses related to the transactions contemplated by this Letter of Intent." Mann, however, believed he and Soucy agreed to a 30-day timeline for completing the acquisition.

Spark and SocialArc also began working together pursuant to a services agreement. Pursuant to that agreement, SocialArc performed Internet and social media marketing services for Spark clients. SocialArc also began performing internal work for Spark, such as updating its website

and automating its statement of work drafting and approval process. Mann believed Spark would pay SocialArc for its work under the services agreement.

The acquisition did not close within the 30-day period anticipated by Mann. As a result, SocialArc required additional funds to maintain its operations until the acquisition closed. Spark thus provided a cash advance of $50,000 to SocialArc pursuant to a master promissory note. Shortly thereafter, Spark advanced another $40,000 to SocialArc under the note. A few weeks later, Spark provided a final advance of $35,000 under the note. In connection with the final advance and at Spark's request, Mann executed a personal guaranty of the note. Spark e-mailed Mann monthly invoices for the amounts due.

In connection with the acquisition, the parties executed various documents including an asset purchase agreement and an employment agreement. The asset purchase agreement referenced the outstanding balance on the note and stated both the note and guaranty "remain outstanding and all amounts due under the Note shall be repaid . . . in accordance with the terms of the Note and the Personal Guaranty."

Pursuant to the employment agreement, Mann would serve as managing director of Spark's digital services division (SDS). Mann's bonus structure was tied to certain profitability targets. For the remainder of his first year, Mann was entitled to a bonus if SDS's operating profit exceeded 20 percent. For subsequent years, Mann was entitled to a bonus if the adjusted revenue growth exceeded 20 percent from the prior year and its operating profit exceeded 20 percent. Conversely, Mann could be terminated for, among other reasons, "failure to achieve the Minimum Threshold Performance," defined as (1) "SDS Adjusted revenue growth of *less than* ten

percent" from the prior year, and (2) "current year SDS operating profit is *less than* fifteen percent." The employment agreement defined "Adjusted revenue growth" as "billable work generated by SDS staff and paid by clients (less any subsequent refunds or credits)," along with shared services credit.[1]

Approximately a year and a half after Spark acquired SocialArc, Soucy informed Mann that SDS would become part of another Spark department and proposed changing Mann's position to chief digital officer. This new position would have no management authority. Mann asserted the change in position would constitute an involuntary termination and entitle him to benefits. Soucy disagreed, noting Mann had not met his performance goals. Soucy and Mann were unable to reach an agreement regarding Mann's ongoing employment, and Spark ultimately terminated Mann for cause for failing to meet the minimum threshold performance metrics.

Mann filed suit against Spark and Soucy for 13 causes of action related to the services agreement and employment agreement. By trial, the complaint alleged seven causes of action for declaratory relief, negligent misrepresentation, concealment (as to the services agreement), breach of contract, breach of the covenant of good faith and fair dealing, concealment (as to the employment agreement), and nonpayment of wages and waiting time penalties.

Spark and Soucy subsequently filed a cross-complaint against Mann, alleging breach of personal guaranty and fraud.[2]

---

[1] SDS received "Shared Services Credit" for internal work it performed for Spark as part of its revenue and profit calculation.

[2] Spark and Soucy also asserted a claim for breach of promissory note, but the trial court granted summary adjudication as to that claim.

At trial, the parties provided conflicting evidence regarding Mann's tenure at Spark. Mann asserted Spark refused to provide SDS with the full allotment of shared services credit for its work. Instead, Spark provided SDS with a flat $10,000 per month credit. Mann also offered evidence that Spark raised SDS's revenue target by $250,000, applied a $238,000 "pro bono" deduction to the amounts billed by SDS in the first half of 2015, applied more total pro bono write-offs to SDS than any other department, instituted a policy that under recorded internal work, allocated credit to other departments for SDS work, failed to support a large project proposal, and created a new department that competed with SDS and reduced its shared services credit. Mann stated he believed SDS's performance "suck[ed]" because the profit and loss (P&L) statements and monthly management reports upon which his assessment was based did not accurately reflect the true amount of work SDS performed.

Spark presented a different perspective on Mann's employment. Spark presented evidence that Mann's interpersonal interactions were creating problems within the company, Spark employees outside SDS generated more than twice the revenue per employee than those in SDS, and SDS's net profit was approximately 8.7 percent.

Spark also disputed Mann's testimony that the P&L statement was misleading or that policy changes were implemented to harm SDS. Spark presented evidence it changed an internal policy to "double count" SDS revenue to incentivize other divisions to work with SDS. Likewise, Spark's vice-president of finance testified he never changed the P&L statements to minimize SDS's numbers and, in fact, he made some modifications at Mann's request to benefit SDS.

At the close of evidence, Mann moved for nonsuit on Spark's cause of action for breach of the personal guaranty. That motion argued the guaranty required Spark to make a written demand in order to trigger Mann's obligation to repay, and Spark had failed to do so. The court denied Mann's motion.

The jury returned a split verdict. On Mann's claims, the jury found in his favor for nonpayment of wages but found in Spark's and Soucy's favor on the remaining claims. As to the cross-complaint, the jury found in Spark's favor for the breach of personal guaranty, but found in Mann's favor on the fraud claim.

Mann filed postjudgment motions for new trial and for judgment notwithstanding the verdict.[3] The motion for new trial asserted juror misconduct and other irregularities, as well as that insufficient evidence supported the verdicts. Mann submitted a juror declaration alleging the jury found in Mann's favor but checked the wrong box when completing the verdict form for the breach of guaranty claim. The motion for judgment notwithstanding the verdict asserted insufficient evidence supported the jury verdicts on Mann's breach of contract and good faith and fair dealing claims, and on Spark's claim for breach of the personal guaranty. The court denied both motions, concluding substantial evidence supported the verdict, the juror declaration was inadmissible, and the verdicts were logical and consistent even if the declaration was admissible.

Judgment was entered and Mann subsequently appealed.

---

[3] Mann also filed a postjudgment motion for equitable accounting, which also was denied, and motions to tax fees and costs and award waiting time penalties, which were granted in part. However, these issues are not relevant to this appeal.

6

## II. DISCUSSION

### A. *Standard of Review*

In reviewing a verdict, we determine whether any substantial evidence, contradicted or uncontradicted, supports the jury's conclusion. (*Piedra v. Dugan* (2004) 123 Cal.App.4th 1483, 1489; *Shapiro v. Prudential Property & Casualty Co.* (1997) 52 Cal.App.4th 722, 730.) We "must review the entire record in the light most favorable to the judgment below and presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence." (*People v. Rivera* (2003) 109 Cal.App.4th 1241, 1244.) " ' "It is not our task to weigh conflicts and disputes in the evidence; that is the province of the trier of fact. Our authority begins and ends with a determination as to whether, on the entire record, there is *any* substantial evidence, contradicted or uncontradicted, in support of the judgment." ' " (*Schwan v. Permann* (2018) 28 Cal.App.5th 678, 693.) " ' "[W]hen two or more inferences can reasonably be deduced from the facts, a reviewing court is without power to substitute its deductions for those of the trial court. If such substantial evidence be found, it is of no consequence that the trial court believing other evidence, or drawing other reasonable inferences, might have reached a contrary conclusion." ' " (*Piedra*, at p. 1489, italics omitted.)

### B. *Breach of Contract and Breach of the Covenant of Good Faith and Fair Dealing Claims*

Mann asserts the jury verdict, which rejected his claims against Spark for breach of contract and breach of the covenant of good faith and fair dealing, was not supported by substantial evidence. We disagree.

#### 1. *Relevant Law*

"The essential elements of a breach of contract claim are: '(1) the contract, (2) plaintiff's performance or excuse for nonperformance, (3) defendant's breach, and (4) the resulting damages to plaintiff.' "

7

(*Hamilton v. Greenwich Investors XXVI, LLC* (2011) 195 Cal.App.4th 1602, 1614.) While the third element of a breach of contract cause of action is the defendant's actual breach, a breach of the implied covenant of good faith and fair dealing cause of action requires proof the defendant unfairly interfered with plaintiff's right to receive the benefits of the contract. The implied covenant is supplemental to the express contractual covenants. (*Racine & Laramie, Ltd. v. Department of Parks & Recreation* (1992) 11 Cal.App.4th 1026, 1031–1032.) It imposes upon each contracting party the duty to do everything the contract presupposes he or she will do to accomplish its purpose but cannot be used to create obligations not contemplated by the contract. (*Pasadena Live v. City of Pasadena* (2004) 114 Cal.App.4th 1089, 1093–1094.)

### 2. Analysis

Mann contends the evidence at trial demonstrates Spark intentionally suppressed SDS's revenue and profitability numbers in order to interfere with Mann's ability to meet the minimum threshold performance requirement in his employment agreement. Mann further argues Spark breached the employment agreement by failing to exercise " 'reasonable discretion' " in determining SDS's profitability and by using a "skewed calculation" of SDS's performance to justify terminating Mann with cause.

We conclude substantial evidence supports the jury verdict. Spark's P&L statements reflected an operating profit of 8.7 percent for SDS—well below the minimum threshold performance requirement. Spark presented evidence that Mann acknowledged SDS's numbers "suck[ed]," and thus it was justified terminating Mann for cause.

In response, Mann criticizes various aspects of Spark's financial statements. First, Mann argues the employment agreement stated shared

8

services credit would be based on actual hours worked, but instead Spark applied a flat $10,000 credit. The employment agreement, however, could reasonably be interpreted as anticipating a budget for such work, as it states any work resulting in shared services credit must be approved "after submission of a Project Approval form including scope, budget and schedule." While it appears Spark may not have had such a form, the language of the agreement indicates the parties did not anticipate an unlimited budget for such work. Spark also presented evidence showing the revenue page of the monthly management report—which Mann received each month—identified the $10,000 budget for current and future months, and Soucy testified he communicated the budget to Mann. Cameron McPherson, Spark's vice-president of finance, also testified the shared service credit allocated to SDS was fair because it was based on a budget and "[i]t's up to [Mann] to decide, being the manager of the group," to make sure his staff work within that budgeted amount.

Next, Mann asserts Spark changed its long-standing policy on timekeeping to eliminate recording time for any shared services work. As a result, Mann asserts it was impossible to properly allocate revenue to SDS, and the change came at a time when demand for SDS to perform shared services work was increasing. However, changes to timekeeping would only be relevant if SDS was billing under its $10,000 budget. But the evidence indicates SDS received credit for the entire $10,000 each month. Accordingly, changes to timekeeping would not impact the allocated shared services credits.

Finally, Mann disputes various expense allocations, such as subjecting SDS to more pro bono write-offs than any other division. At trial, Spark presented a wide range of evidence regarding its P&L statements and its cost

9

allocation among departments. McPherson and Julie Mann[4] testified they worked together to create SDS's first P&L statement. Their goal was to create an accurate and equitable distribution of expenses, and they believed the P&L statements met that goal. At no point was Soucy involved in the creation of the P&L statements. However, once they were created, Soucy reviewed the P&L statements with Mann. On at least two separate occasions, Mann acknowledged SDS's results "suck[ed]." In response to his meetings with Soucy regarding SDS's performance, Mann's approach was to propose a new agreement regarding his compensation. Mann testified his goal was for a "change in the yardstick that I was being measured on." At no point did Mann state his goal was to dispute the numbers being presented regarding SDS's performance.

Mann also offered expert testimony from a forensic accountant and business valuator, Frank Wisehart, in support of his position. Wisehart testified Spark's financial records were unreliable, and he created reconstructed income statements evidencing Mann would have met the minimum threshold performance in his employment agreement had Spark properly calculated SDS's performance. Wisehart testified his reconstructed income statements were based, in part, on projections and assumptions and timecard data.

In response, Spark offered evidence undermining the validity of Wisehart's approach. Regarding his use of projections, Wisehart acknowledged on cross-examination that the reconstructed financial statements "[p]robably" did not reflect what "actually happened." He further

---

[4] Julie Mann worked as the controller for SocialArc and transferred into Spark as an accounting manager upon SocialArc's acquisition.

acknowledged some of his data was from projections created before Mann even began working for Spark.

Spark's expert, Daniel Ray, broadly criticized Wisehart's reconstructed financial statements as speculative and unreliable. For example, Wisehart testified almost all revenue items were derived from timecard data. But Ray rejected this approach of relying on time records as opposed to bills actually paid because no business would consider time records reflective of revenue. Moreover, the employment agreement defined revenue as not just time billed but time billed "and paid by clients." Ray also disputed Wisehart's addition of approximately $1.4 million of additional revenue based on purported billed hours not reflected in time records, noted the reconstructed financial statements' use of identical gross potential revenues for every quarter of 2015 was highly unusual, and explained the increase in revenue reflected in Wisehart's statements did not correspond to the decreased number of SDS employees over that same period.

Spark also presented evidence supporting their financial records. Soucy testified Spark's balance sheets and P&L statements were reviewed annually by an outside accounting firm, and at no time had that firm ever raised concerns about Spark's financial records. And, ultimately, Wisehart could not say whether any anomalies identified in Spark's financial data prevented Mann from reaching the minimum threshold performance required under his employment agreement.

In sum, Spark presented substantial evidence at trial supporting its financial records, including its P&L statements, which demonstrated Mann failed to meet his minimum threshold performance goals and could be terminated for cause. Likewise, Spark presented substantial evidence that Mann's failure to meet such goals was not the result of Spark's bad faith or

11

its failure to exercise " 'reasonable discretion' " in determining SDS's profitability. Accordingly, the record supports the jury verdict rejecting Mann's breach of contract and breach of the covenant of good faith and fair dealing claims.[5]

## C. *Motion for Nonsuit*

"On appeal from the denial of a motion for nonsuit, we apply the same rules that the trial court applied. A defendant is entitled to a nonsuit if we find that the plaintiff's evidence is not sufficient as a matter of law to permit a jury to find in his or her favor. When making this determination, we do not weigh the evidence or determine the credibility of witnesses, but accept that view of the evidence most favorable to the plaintiff as true and disregard all contrary evidence. We indulge in every legitimate inference that may be drawn from the plaintiff's evidence. [Citations.] . . . As a motion for nonsuit raises an issue of law, we review the trial court's ruling de novo on appeal." (*A.M. v. Albertsons, LLC* (2009) 178 Cal.App.4th 455, 463.)

### 1. *Relevant Background*

The personal guaranty executed by Mann states that he, as guarantor, "unconditionally guarantees and promises (i) to promptly pay to [Spark] . . . on demand . . . any and all Obligations (as hereinafter defined) consisting of payments due to [Spark], and, (ii) at [Spark's] option and not in substitution for [Mann's] payment obligations hereunder, to perform on demand any and all other Obligations in the place of [SocialArc] . . . ." The guaranty further states it "is absolute, unconditional, continuing and irrevocable and constitutes an independent guaranty of payment . . . and is in no way

---

[5] Because we conclude substantial evidence supports a finding that Mann failed to meet his performance metrics and thus constitutes cause for his termination, we need not address whether Spark's other alleged bases for good cause termination have merit.

conditioned on or contingent upon any attempt to enforce in whole or in part any of [SocialArc's] Obligations to [Spark] . . . . If [SocialArc] shall fail to pay or perform any Obligations to [Spark] which are subject to this Guaranty as and when they are due, [Mann] shall, promptly pay to [Spark] all such liabilities or obligations in immediately available funds."

Section 3 of the guaranty, entitled "Waivers," states in part Mann "waives, to the extent permitted by applicable law, . . . (v) all presentments, demands for performance, notices of non-performance, notices delivered under the Note, protests, notice of dishonor, and notices of acceptance of this Guaranty and of the existence, creation or incurring of new or additional Obligations and notices of any public or private foreclosure sale . . . ."

Section 5(a) of the guaranty provides "all notices or other communications to or upon [Spark] or [Mann] under this Guaranty shall be in writing and shall be faxed, mailed or delivered to each party at its facsimile number or address as set forth below with respect to [Spark] and at the facsimile number or address set forth on the signature page hereof with respect to [Mann]." The signature page lists an address in Berkeley, California for Mann.

Spark subsequently e-mailed monthly invoices to Mann at his Spark e-mail address. Those invoices identified SocialArc under the "Bill To" category, listed the principal payment and interest owed, and stated the invoice was "Due upon receipt." McPherson also testified a copy of Mann's personal guaranty was attached to the e-mails. During the parties' negotiations over Mann's termination, Spark sent an e-mail to Mann stating, "As you know, you have a personal guaranteed note that is due in the amount of $125,000 and interest is accruing on the note," and implying future legal

13

action against Spark would result in Spark "seek[ing] an immediate demand of repayment in full . . . ."

At the close of evidence, Mann moved for nonsuit on Spark's claim for breach of the personal guaranty. Mann argued there was no written demand in the record and, accordingly, Mann had no repayment obligation. In response, Spark asserted Mann's obligation under the personal guaranty automatically arose the moment SocialArc failed to repay its loans. Spark further noted the jury could construe the e-mails sent to Mann as an adequate demand. The court denied the motion.

### 2. *Analysis*

Generally, "[a] lender is entitled to judgment on a breach of guaranty claim based upon undisputed evidence that (1) there is a valid guaranty, (2) the borrower has defaulted, and (3) the guarantor failed to perform under the guaranty." (*Gray1 CPB, LLC v. Kolokotronis* (2011) 202 Cal.App.4th 480, 486 (*Gray1*).) Mann does not assert Spark failed to prove any of these elements at trial. He does not dispute the validity of the guaranty or the fact neither SocialArc nor he has repaid the loans. Rather, he contends Spark failed to give proper notice of SocialArc's default and thus his obligation under the guaranty was never triggered. Mann contends the e-mailed invoices were insufficient to constitute a demand for payment.

We disagree. Undoubtedly, the guaranty states it is "on demand." But that phrase is used to denote the type of obligation rather than impose a precondition to repayment. Cases discussing the statute of limitations for such actions provide useful guidance. In such context, courts have uniformly held " 'a cause of action for money payable on demand accrues with the inception of the obligation and without the necessity for any demand.' " (*Carrasco v. Greco Canning Co.* (1943) 58 Cal.App.2d 673, 675; see also

14

*California First Bank v. Braden* (1989) 216 Cal.App.3d 672, 677 ["For a guaranty, the breach occurs when the note falls due and remains unpaid. [Citation.] Ordinarily, the statute of limitations commences running upon the breach."].) It would be illogical for a guarantor to have no obligation to pay while, at the same time, the limitations period runs.

Mann cites one case, *Gray1*, *supra*, 202 Cal.App.4th 480, to support his position that a written demand was required to trigger his repayment obligation under the guaranty. In *Gray1*, the court addressed whether a contract signed between the parties constituted a guaranty or a demand note protected by the antideficiency statutes and the one-action rule. (*Id.* at p. 482.) In concluding the agreement was a guaranty, it rejected the plaintiff's argument that the phrase "on demand" transmuted the guaranty into a demand note. (*Id.* at p. 488.) The court then commented, "The plain meaning of 'on demand' is that the Guarantor's obligation to pay does not arise until the Lender demands the Guarantor step in to answer for the debt of the Borrower. It is not, as the Guarantor would have us conclude, a trigger to allow the Lender to ignore the Borrower entirely and demand payment by the Guarantor even in the absence of the Borrower's default." (*Ibid.*)

We do not find *Gray1* persuasive as to whether a guaranty payable "on demand" requires, in fact, a demand as contemplated by Mann to trigger repayment obligations. Rather, *Gray1* focused on whether a contract was a guaranty or demand note; it did not address the requirements to enforce a guaranty. Moreover, the court's passing comment in *Gray1* is at odds with both the above authority and Civil Code section 2807, which provides a surety or guarantor[6] "who has assumed liability for payment or performance

_____

[6] "The distinction between sureties and guarantors is hereby abolished. The terms and their derivatives, wherever used in this code or in any other

15

is liable to the creditor immediately upon the default of the principal, and without demand or notice." (Civ. Code, § 2807.)

Mann next argues any interpretation of the guaranty that either excused a need for a demand or interpreted the e-mails to constitute a demand would "read Sections 1(a) and 5(a) out of the contract." But Mann's interpretation would read other provisions out of the contract—namely, section 1(a), which stated Mann's guaranty is "unconditional[ ]," and section 3(b)(v), which waives in relevant part "all presentments, demands for performance, [and] notices of non-performance."

Under statutory rules of contract interpretation, a contract must be read to give effect to the mutual intention of the parties at the time it was made. (Civ. Code, § 1636.) Mutual intent is to be inferred, if possible, solely from the written provisions of the contract. (*Id.*, § 1639.) The court's function is to ascertain what, in terms and substance, is contained in the contract, not to insert what has been omitted or to omit what has been inserted. (Code Civ. Proc., § 1858.) Applying these rules, we "look first to the language of the contract in order to ascertain its plain meaning or the meaning a layperson would ordinarily attach to it." (*Waller v. Truck Ins. Exchange, Inc.* (1995) 11 Cal.4th 1, 18.) If there is no ambiguity, the clear and explicit meaning controls. (*Santisas v. Goodin* (1998) 17 Cal.4th 599, 608.)

Here, the guaranty is not ambiguous because its various provisions can be harmonized. The guaranty's structure as an unconditional promise to pay on demand is not ambiguous, but rather tracks the definition of a negotiable instrument. (See Cal. U. Com. Code, § 3104, subd. (a).) Likewise, there is no conflict between the "on demand" phrasing, the waiver of notice, and the

---

statute or law of this state now in force or hereafter enacted, shall have the same meaning as defined in this section." (Civ. Code, § 2787.)

notice provisions. As explained above, the waiver of presentment, demands for performance, and notices of nonperformance, comply with the requirements of Civil Code section 2807. And, "[i]n the great majority of cases, presentment is waived with respect to notes. In most cases, a formal demand for payment to the maker of the note is not contemplated. . . . If payment is not made when due, the holder usually makes a demand for payment, but in the normal case in which presentment is waived, demand is irrelevant, and the holder can proceed against indorsers where payment is not received." (10 Cal.Jur.3d (2021) Bills and Notes, § 194, fns. omitted.)

Finally, Mann argues Spark failed to make a "proper" demand. But he does not identify any authority suggesting demands, to the extent they are required, must be presented in any specific form. In fact, courts have held the mere filing of a suit can amount to a demand. For example, in *Root v. American Equity Specialty Ins. Co.* (2005) 130 Cal.App.4th 926, the court reasoned, "a suit, even an unserved suit, easily fits several of the definitions of 'demand' as an ordinary person might think of the word demand. 'The action or fact of demanding or claiming in legal form; a legal claim . . . . To ask for (a thing) with legal right or authority; to claim as something one is legally or rightfully entitled to.' " (*Id.* at p. 933; see *Bloom v. Bender* (1957) 48 Cal.2d 793, 799–800 [guarantor received proper notice of her obligation because the filing and serving of a lawsuit against her "constituted sufficient notice of default"].)

Here, the e-mails sent to Mann included the invoices identifying the unpaid principal and interest. And McPherson provided undisputed testimony that Mann's personal guaranty—under which he was liable for the

17

unpaid amounts—was also attached to those e-mails.  Accordingly, these e-mails sufficiently alerted Mann of his obligation to repay the loan amounts.[7]

## III.  DISPOSITION

The judgment is affirmed.  Defendants Spark Public Relations, LLC and Alan Soucy may recover their costs on appeal.  (Cal. Rules of Court, rule 8.278(a)(1), (2).)

---

[7] Because we conclude the trial court did not err in denying Mann's motion for nonsuit, we need not address his argument that such error was prejudicial.  Likewise, we need not address Mann's request that this court order an accounting on remand because we affirm the underlying judgment.

MARGULIES, J.

WE CONCUR:

HUMES, P. J.

BANKE, J.

A155257
*Mann v. Spark Public Relations, LLC*